# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

April 17, 2009

Charles R. Fulbruge III
Clerk

No. 08-10404

SECURITIES AND EXCHANGE COMMISSION

Plaintiff – Appellee

v.

SCOTT B GANN

Defendant – Appellant

Appeal from the United States District Court
for the Northern District of Texas

Before JONES, Chief Judge, and WIENER and STEWART, Circuit Judges.

WIENER, Circuit Judge:

This civil enforcement action against Defendant-Appellant Scott B. Gann ("Gann"), a stockbroker, arose out of Gann's market-timing trades placed on behalf of a client. The Securities and Exchange Commission (the "SEC") alleged that Gann violated Section 10(b) ("Section 10(b)") of the Securities Exchange Act of 1934 and Rule 10b-5 ("Rule 10b-5") promulgated thereunder by conducting short-term trades in a number of mutual funds. Gann claimed that his trades complied with the rules of the various funds and that, in any event, market timing is legal and his practices were not deceptive. At trial, the district court found Gann not credible and determined that he had violated Section 10(b) and Rule 10b-5. Gann was ordered to disgorge his profits and pay a civil penalty.

The district court also imposed a permanent injunction against future violations.

Gann now asserts that the district court erred in finding that he made material misstatements with an intent to deceive, as is required to find a violation of Section 10(b) and Rule 10b-5. Additionally, he contends that, far from supporting a finding of *scienter*, the evidence demonstrates his *lack* of intent to deceive. Finding no clear error, we affirm the district court's judgment.

## I. FACTS AND PROCEEDINGS

In 2002, Gann and a co-worker at Southwest Securities, Inc. ("SWS"), George Fasciano ("Fasciano"), put together a plan for a new customer, Haidar Capital Management and Capital Advisor ("HCM"), to trade mutual funds by timing the market. After HCM asked Fasciano whether SWS would be willing to place market-timing trades on its behalf, Fasciano enlisted Gann to work with him, and the two agreed to share all commissions.[1]

Market timing is not illegal, but many mutual fund companies prohibit this type of trading of shares of their funds. Market timers typically buy and sell shares of a mutual fund quickly to take advantage of minute, short-term differentials between a fund's value and the value of the securities it holds. Fund companies object that market timers' gains come at the expense of long-term investors and increase transaction costs, so such companies employ a number of strategies to discover and impede traders engaging in the practice. Brokers who time the market sometimes receive "block notices" from funds in which they have bought and sold shares. A block notice typically informs the broker that he has run afoul of a fund's restrictions and bars specified accounts controlled by the broker from future trades. Brokers can be identified by their registered representative number; clients can be identified by their account number or numbers. A block notice might bar trades under the broker's number,

---

[1] Their commission rate was 1.5 percent of the total assets managed for HCM.

the client's account number, or the number attached to a brokerage or its branch office. Despite the show of discouraging market timing, not all funds prohibit the practice.[2]

Intending to accept HCM's business, Gann and Fasciano undertook an extensive survey of various fund companies' market-timing rules and requirements. All involved recognized that the trades would have to occur "under the radar" of the various funds to avoid triggering block notices. SWS then set up a trading desk to operate the HCM business. Gann and Fasciano opened 21 accounts for nine HCM affiliates, albeit the investors in each were the same.[3] A third SWS employee was responsible for ensuring that the trades complied with each fund's market-timing rules and alerting funds to specific large trades when so required.

Trading on HCM's behalf began February 10, 2003. SWS received the first block notice 15 days later. After receiving a block notice, Gann and Fasciano would switch the identifier number they were using, enabling them to continue trading, at least temporarily. Over seven months, they concluded 2,500 trades — $650 million in aggregate value — in the mutual funds of fifty-six companies. During this period, they received sixty-nine block notices — a rate of about 3 percent. Gann earned $56,640.67 for his work on behalf of HCM.

The SEC filed a civil enforcement action against Gann and Fasciano in January 2005, asserting that the HCM trades had violated Section 10(b)[4] and

---

[2] *See, e.g., SEC v. Tambone*, 550 F.3d 106, 113 (1st Cir. 2008) (executives at fund company agreed to at least 13 different market-timing arrangements); *Prusky v. ReliaStar Life Ins. Co.*, 532 F.3d 252, 255 (3d Cir. 2008) (defendants had negotiated permission to place market-timing trades, within express limits, in the funds of ING).

[3] Gann and Fasciano used their registered representative numbers and that of a joint partnership they established to trade under HCM's account numbers. Gann's broker number was attached to nine of the 21 account numbers, Fasciano's to another nine, and the joint partnership's to three.

[4] 15 U.S.C. § 78j(b).

Rule 10b-5.[5]  Fasciano settled without admitting wrongdoing.[6]  Following a three-day bench trial, the district court found that Gann had made material misstatements with intent to deceive in violation of Section 10(b) and Rule 10b-5.  The court entered judgment against Gann, requiring him to disgorge the profits earned from the HCM trades[7] and to pay a $50,000 civil penalty, as well as enjoining him from future violations.  Gann timely appealed.

## II. ANALYSIS

### A. Standard of Review

In an appeal from a bench trial, we review the district court's findings of fact for clear error and questions of law *de novo*.[8]  We will find clear error if:

> (1) the findings are without substantial evidence to support them, (2) the court misapprehended the effect of the evidence, and (3) although there is evidence which if credible would be substantial, the force and effect of the testimony, considered as a whole, convinces the court that the findings are so against the preponderance of credible testimony that they do not reflect or represent the truth and right of the case.[9]

### B. *Scienter*

Gann unquestionably engaged in market timing.  The question here is whether he did so in a manner that violated Section 10(b) and Rule 10b-5.[10]  The

---

[5] 17 C.F.R. § 240.10b-5.

[6] In his settlement, Fasciano agreed to disgorge his profits from the transactions, pay a $30,000 civil penalty and to a permanent injunction against future violations.

[7] $56,640.67 plus pre-judgment interest.

[8] *Water Craft Mgmt. LLC v. Mercury Marine*, 457 F.3d 484, 488 (5th Cir. 2006) (quoting *In re Mid-South Towing Co.*, 418 F.3d 526, 531 (5th Cir. 2005)).

[9] *Id.* (citing *Moorhead v. Mitsubishi Aircraft Int'l, Inc.*, 828 F.2d 278, 283 (5th Cir.1987)).

[10] The scope of liability is the same under both provisions.  *See, e.g., SEC v. Zandford*, 535 U.S. 813, 816 n.1 (2002).

SEC was required to show, by a preponderance of the evidence,[11] that the defendant, (1) made a misstatement or omission (2) of material fact (3) in connection with the purchase or sale of securities (4) with *scienter*.[12] To have acted with *scienter*, the defendant must have acted with "a mental state embracing intent to deceive, manipulate, or defraud."[13]

As noted, Gann first insists that (1) there is no evidence that he made material misstatements; and (2) rather than demonstrating that he had the requisite mental state, the evidence proves his *lack of* intent to deceive.[14]

*1. Material Misstatement*

The material misstatements at issue are Gann's use of different and varying client account numbers to disguise the frequency and magnitude of HCM's trading in the various funds. To commit securities fraud in violation of Section 10(b) and Rule 10b-5, a defendant must act intentionally or with severe recklessness, which is defined as a "highly unreasonable omission[] or

---

[11] *See, e.g.*, *SEC v. First Fin. Group of Tex.*, 645 F.2d 429, 435 (5th Cir. May 1981) (citing with approval *SEC v. Savoy Indus., Inc.*, 587 F.2d 1149, 1168 (D.C. Cir. 1978)).

[12] 17 C.F.R. § 240.10b-5; *Aaron v. SEC*, 446 U.S. 680, 691 (1980) (violation of Section 10(b) and Rule 10b-5 requires defendant to have acted with *scienter*); *see also Plotkin v. IP Axess Inc.*, 407 F.3d 690, 696 (5th Cir. 2005) (stating the rule in a private civil action).

[13] *Nathenson v. Zonagen Inc.*, 267 F.3d 400, 408 (5th Cir. 2001) (addressing *scienter* in a securities fraud case and quoting *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 n.12 (1976)).

[14] In his brief, Gann purports to claim errors of law with respect to his material misstatement and *scienter* arguments. He offers no legal analysis, however, so we find any such arguments waived. *N.W. Enters. Inc. v. City of Houston*, 352 F.3d 162, 183 n.24 (5th Cir. 2003) ("A litigant's failure to provide legal or factual analysis results in waiver."). An appellant's brief must contain his "contentions and the reasons for them, with citations to the authorities and parts of the record on which the appellant relies." FED. R. APP. P. 28(a)(9).

misrepresentation[]."[15] That omission or misrepresentation must be material,[16] that is, it must be reasonably calculated to influence the decisions of an investor — institutional or otherwise — in its trading in securities.[17] That which is reasonably calculated to influence the individual investor may not be reasonably calculated to influence an institutional investor, and vice versa. Here, Gann does not challenge the materiality of the alleged misrepresentations; rather, he contends that there were no misrepresentations. The district court held that Gann's practice of switching identifying broker and client account numbers constituted materially misleading statements in violation of the securities laws.

Gann's claim of district court error in this regard essentially asks us to adopt his view of the facts. He contends that SWS was in contact with the fund companies before and after the block notices were sent. As such, the fund companies were aware that Gann continued trading and could not have been misled. In support of this, Gann points to the testimony of a co-worker and of an HCM representative that the system SWS put in place to run the HCM trades was meant to ensure that the trades would be compliant with the various

---

[15] *Ind. Elec. Workers' Pension Trust Fund IBEW v. Shaw Group, Inc.*, 537 F.3d 527, 533 (5th Cir. 2008).

[16] 17 C.F.R. § 240.10b-5.

[17] The district court considered a misrepresentation to be material if "a reasonable man would attach importance to the fact misrepresented in determining his course of action." The district court quoted the rule from *Wheat v. Hall.* 535 F.2d 874, 876 (5th Cir. 1976) (private civil damages suit). The danger of misleading the "victim" must have been known or "so obvious that the defendant must have been aware of it." *Nathenson*, 267 F.3d at 408. We have not defined "material" for the purposes of a civil enforcement action, but we have held that, in private civil litigation, a misrepresentation is material when it "would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *Rosenzweig v. Azurix Corp.*, 332 F.3d 854, 865-66 (5th Cir. 2003) (quoting *Basic, Inc. v. Levinson*, 485 U.S. 224, 231 (1988)). Other circuits have said that, in a civil enforcement action, a statement or omission is "material" "if there is a substantial likelihood that a reasonable investor would consider the information significant when making an investment decision." *See, e.g., SEC v. Wolfson*, 539 F.3d 1249, 1262 (10th Cir. 2008).

funds' rules. He also points us to his own testimony and that of the co-worker that the fund companies' block notices were not the last word on what they would permit. And, he states that HCM was on notice that SWS intended to comply with the funds' market-timing regulations. These assertions ignore that, irrespective of whether SWS had an elaborate notification system in place, the claim is that the funds were still misled. They also ignore that HCM's view is irrelevant. What matters is the perception of the fund companies. Notably, Gann does not point to anything that indicates the fund companies were aware of SWS's notification system.

Gann's argument overlooks the standard of review in this case. Even if we were persuaded that his might be the better view of the facts, this would be insufficient to permit us to reverse the district court. His view of the facts may be plausible, but that is not evidence of clear error when, as here, the district court's interpretation is reasonable.

The SEC's proof that Gann's use of different numbers to conduct his trades demonstrates that he did not want the fund companies catching on to his trading practices. In one instance, Fasciano traded a Goldman Sachs fund three times and received a block notice, yet he and Gann placed five more trades under a different number, received two more block notices, and still continued placing trades. Goldman Sachs repeatedly attempted to stop Gann and Fasciano from trading in its fund, and they repeatedly switched identifier numbers to misrepresent the source of the trades and thwart the company's attempts.[18] We view the SEC's characterization of the use of multiple registration and account numbers as ample evidence of an intent to mislead.

---

[18] The district court enumerated Gann's similar pattern of trading in the shares of a half-dozen mutual funds.

Neither are we the first to consider the question. In *United States v. Ficken*, the First Circuit affirmed a similar finding, although on stronger facts.[19] In that case, the district court found the broker's numbers-switching a material misrepresentation and sufficient evidence of *scienter* under Section 10(b) to grant summary judgment in favor of the government, and the First Circuit affirmed.[20] Here, the district court's finding that the use of various and changing identifier numbers was a material misrepresentation constituted a reasonable interpretation of the facts and thus was not clearly erroneous.

*2. Evidence of Scienter*

Gann's second argument is that, in contrast to the district court's finding, the evidence at trial demonstrated that he lacked the *scienter* necessary to violate Section 10(b) and Rule 10b-5. As with his material misrepresentation point of error, Gann's *scienter* argument is largely devoted to recounting his view of the facts; and the court's factual basis for finding that Gann made material misrepresentations and that he acted with *scienter* are very similar. Again, our standard of review is deferential and is here determinative. "If the district court's account of the evidence is plausible in light of the record viewed in its entirety, the court of appeals may not reverse it even though convinced that, had it been sitting as trier of fact, it would have weighed the evidence differently."[21]

Gann's primary contention is that the SEC mischaracterized the fund companies' rules regarding market timing, making it seem as though they were blanket prohibitions on the trading strategy. Gann claims that, as a result of

---

[19] *United States v. Ficken*, 546 F.3d 45, 51, 54 (1st Cir. 2008). Ficken had at least seven broker registration numbers under his name and opened more than 170 accounts for five clients using fake names to conceal their identity.

[20] *Id.*

[21] *Estate of Lisle v. Comm'r of Internal Revenue*, 541 F.3d 595, 601 (5th Cir. 2008) (quoting *Anderson v. Bessemer City, N.C.*, 470 U.S. 564, 573-74 (1985)).

this, the district court incorrectly believed that any attempt to time the market would violate the funds' regulations and harm investors, and, thus must have been intended to deceive.[22] Gann rationalizes his attempts to fly below the funds' radar, as it were, by claiming this meant only that his trades would not attract the companies' attention because they were compliant. He asserts that the fund companies permitted market timing to an extent so such trades could be conducted without deception. From his perspective, the research that he and Fasciano undertook evidenced SWS's intent to comply with the funds' various rules, not to evade them. He advances that some fund companies expressly permitted market-timing activities within prescribed boundaries, and that others did so either tacitly or by agreement. Gann reasons that efforts by SWS to comply with the rules and determine how compliant market-timing trades could be placed — as well as some companies' agreements to permit such trades — confirm that the brokers had no intent to deceive.

The SEC is essentially enforcing corporate regulations on behalf of the various mutual funds. Because market timing itself is not illegal, the SEC had to prove an intent to deceive to fit Gann's behavior within Section 10(b) and Rule 10b-5. This creates a dilemma for the courts, which are asked to determine whether the defendant's *legal* acts are made *illegal* by his compliance or non-compliance with corporate regulations that companies sometimes suspend or ignore, either tacitly or expressly, depending on the circumstances of that particular trade. AIM Funds, for example, reserves the right to reject trades that it deems harmful to its investors, and it limited SWS to 10 trades per account. In AIM Funds's block notice to SWS, it identified a client account

---

[22] To repeat, the complaint about market timing is that it dilutes returns for long-term investors and increases the funds' own trading costs. *See, e.g.*, *United States v. Tambone*, 550 F.3d 106, 112 (1st Cir. 2008). Here, the district court found only that Gann intended to deceive the fund companies, rather than individual investors. The SEC had claimed both.

number (an HCM account) that would no longer be permitted to trade. The Hartford, in contrast, issued a blanket block on all future trades by Gann until he could show compliance.

The SEC's chief evidence of Gann's intent to deceive was his use of numerous account and registration numbers that actually represented his (and Fasciano's) work for HCM. The SEC contended that Gann's efforts were meant to circumvent the funds' regulations for his own gain and that of his customer. We perceive the evidence in this case to be in equipoise, making critical the question of credibility. The district court found Gann not credible and sided with the SEC. Based on this express finding, the district court adopted the SEC's version of the facts. Credibility is uniquely "the province of the trier of fact," and we defer to it.[23]

Gann has not made a factual showing that so outweighs the evidence offered by the SEC as to demonstrate that the district court clearly erred. "Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous."[24] Having no "definite and firm conviction that a mistake has been committed,"[25] we affirm.

## C. Penalties

The district court imposed three penalties on Gann: (1) a permanent injunction against violating Rule 10b-5 and Section 10(b), (2) disgorgement of his profits with interest, and (3) a civil penalty of $50,000. Gann contends that these penalties were assessed in error. He makes no legal argument whatsoever as to how the district court erred with respect to the disgorgement and civil

---

[23] *In re Mid-South Towing Co.*, 418 F.3d 526, 535 (5th Cir. 2005).

[24] *Anderson v. Bessemer City, N.C.*, 470 U.S. 564, 574 (1985).

[25] *Canal Barge Co. v. Torco Oil Co., Inc.*, 220 F.3d 370, 375 (5th Cir. 2000). We emphasize again, however, that market timing is not illegal. The SEC's prosecution of Gann is based on the fund companies' regulations and Gann's violation of those regulations.

penalty — only asserting once again that the district court got the facts wrong. As a result, Gann has waived these arguments and we affirm the monetary penalty and disgorgement.[26]

With respect to the injunction, Gann asserts that because he no longer trades mutual funds, the injunction should not issue. We review the grant of a permanent injunction for abuse of discretion.[27] Without more, a defendant's past violation of the securities laws here at issue is insufficient to support permanent injunctive relief.[28] Instead, we ask whether the defendant's past conduct gives rise to an inference that, in light of present circumstances, there is a "'reasonable likelihood' of future transgressions."[29] In imposing a permanent injunction, the district court must consider a number of factors, including the (1) egregiousness of the defendant's conduct, (2) isolated or recurrent nature of the violation, (3) degree of *scienter*, (4) sincerity of defendant's recognition of his transgression, and (5) likelihood of the defendant's job providing opportunities for future violations.[30]

Gann's sole argument is that, as he no longer sells mutual funds, the injunction is unnecessary. He ignores the fact that whether a defendant's job will provide future opportunities for a violation is only one of the factors that the district courts consider. Even if he were correct that his cessation of selling mutual funds counseled against the issuance of the injunction, he completely ignores the other factors on which the district court relied. Gann's conclusional

---

[26] *Procter & Gamble Co. v. Amway Corp.*, 376 F.3d 496, 499 n.1 (5th Cir. 2004) ("Failure adequately to brief an issue on appeal constitutes waiver of that argument.").

[27] *ITT Educ. Servs., Inc. v. Arce*, 533 F.3d 342, 344 (5th Cir. 2008).

[28] *SEC v. Zale Corp.*, 650 F.2d 718, 720 (5th Cir. July 1981).

[29] *Id.* (surveying cases from the Third, Fifth and Ninth circuits).

[30] *SEC v. Blatt*, 583 F.2d 1325, 1334 n.29 (5th Cir. 1978).

assertion is not only an insufficient basis on which to overturn the injunction, it also ignores the substance of the factor with which he takes issue. The question is whether his job *provides opportunities* for future infractions. Gann is still a stockbroker, so whether or not he trades mutual funds, his job certainly permits him the opportunity to do so. Gann's argument is insufficient to persuade us that the district court's conclusion on this factor was incorrect, much less that it was an abuse of discretion outweighing the other independent factors. We affirm the imposition of the injunction.

## III. CONCLUSION

For the foregoing reasons, the judgment of the district court is AFFIRMED.