SECURITIES AND EXCHANGE COMMISSION, Plaintiff

v.

LIFE PARTNERS HOLDINGS, INC., Brian Pardo, and R. Scott Peden, Defendants.

Civil Action No. 1–12–CV–33–JRN.

United States District Court, W.D. Texas, Austin Division.

Signed Dec. 2, 2014.

616

B. David Fraser, Jessica Bogan Magee, Matthew J. Gulde, U.S. Securities and Exchange Commission, Fort Worth, TX, for Plaintiff.

Dana Livingston, Alexander Dubose Jefferson & Townsend LLP, J. Pete Laney, The Law Offices of J Pete Laney, Austin, TX, Elizabeth L. Yingling, Laura J. O'Rourke, Meghan Elizabeth Hausler, Will R. Daugherty, Baker & McKenzie LLP, Jay Ethington, Law Office of Jay Ethington, Robert Allen Hawkins, S. Cass Weiland, Squire Patton Boggs (US) LLP, Dallas, TX, for Defendants.

### *FINAL JUDGMENT ORDER*

JAMES R. NOWLIN, District Judge.

Before the Court are Defendants' Motion for Entry of Judgment (Dkt. No. 292); Plaintiff's Motion for Judgment as a Matter of Law (Dkt. No. 293); Defendants' Response in Opposition to Plaintiff's Motion (Dkt. No. 297); and Plaintiff's Reply to Defendants' Response to Plaintiff's Motion for Judgment as a Matter of Law. (Dkt. No. 298).

### I. OVERVIEW

The Commission alleged, and the jury found, that Defendants committed fraud in violation of Section 17(a)(1) of the Securities Act of 1933 ("Securities Act"). The jury also found that LPHI, aided and abet-

ted by Pardo and Peden, filed numerous false and misleading Forms 10QSB, 10–Q, 10KSB, and 10–K in violation of Section 13(a) of the Securities and Exchange Act of 1934 ("Exchange Act") and Rules 12b–20, 13a–1, and 13a–13 thereunder. The jury also found that Pardo violated Exchange Act Rule 13a–14 by knowingly certifying false public reports that LPHI filed with the Commission during that period. The Court set aside the jury's 17(a)(1) verdict, but left the remainder of the jury's findings undisturbed.

## II. DISCUSSION

The question now before the Court is what sanctions should result from the jury's findings. Defendants argue that no sanctions are necessary. The Commission, on the other hand, requests an Order from this Court (1) permanently enjoining Defendants from future violations of the relevant securities laws; (2) requiring Defendants to jointly and severally disgorge their ill-gotten gains received as a result of wrongdoing; (3) requiring each Defendant to pay civil penalties; and (4) requiring Pardo to reimburse LPHI $13,340,371 in accordance with Section 304 of the Sarbanes–Oxley Act of 2002.

### A. *Each Defendant's Conduct Warrants Entry Of A Permanent Injunction.*

Plaintiff argues that permanent injunctive relief is appropriate since Defendants' actions were egregious and accompanied by *scienter*, and since there is an ongoing risk that Defendants will violate securities laws again in the future.

■ Section 21(d) of the Exchange Act allows for the entry of permanent injunctions in enforcement actions brought by the Commission when the evidence establishes a "reasonable likelihood" that a Defendant will engage in future violation of the securities laws. *See* 15 U.S.C.

§ 77t(b); 15 U.S.C. § 78u(d)(1); *SEC v. Zale Corp.*, 650 F.2d 718, 720 (5th Cir. 1981); *SEC v. Murphy*, 626 F.2d 633, 655 (9th Cir.1980); *see also SEC v. Koracorp Indus., Inc.*, 575 F.2d 692 (9th Cir.1978), *cert. denied sub nom., Helfat v. SEC*, 439 U.S. 953, 99 S.Ct. 348, 58 L.Ed.2d 343 (1978). "[T]he Commission is entitled to prevail when the inferences flowing from the defendant's prior illegal conduct, viewed in light of present circumstances, betoken a 'reasonable likelihood' of future transgressions." *Zale Corp.*, 650 F.2d at 720; *see SEC v. Caterinicchia*, 613 F.2d 102 (5th Cir.1980); *SEC v. Blatt*, 583 F.2d 1325 (5th Cir.1978). In predicting the likelihood of future violations, courts evaluate the totality of the circumstances. *Zale Corp.*, 650 F.2d at 720.

■ When evaluating SEC requests for injunctive relief, Courts consider: (1) the egregiousness of the defendant's conduct; (2) the degree of *scienter*; (3) the isolated or recurrent nature of the violation; (4) the sincerity of the defendant's recognition of his transgression; and (5) the likelihood of the defendant's job providing opportunities for future violations. *SEC v. Gann*, 565 F.3d 932, 940 (5th Cir.2009); *Blatt*, 583 F.2d at 1334.

■ Defendants argue that their conduct was not egregious. In support, Defendants note that the SEC did not ultimately succeed in obtaining favorable outcomes on the Commission's core allegations against LPHI. Yet these "minor" charges are not minor at all. In finding that the SEC proved that LPHI, aided and abetted by Defendants Pardo and Peden, violated Section 13(a) of the Securities and Exchange Act of 1934 and Rules 12b–20, 13a–1, and 13a–13, the jury judged that LPHI, Pardo, and Peden deprived the investing public of the information it needed to make a fully informed decision about whether to invest in Life Partners. Given that disclosure is

the basis of American securities law, these are serious violations.

Additionally, contrary to Defendants arguments, the record contains a great deal of evidence that Defendants understood that Life Partners may not have been complying with the company's legal obligations. Nevertheless, the evidence suggests that Defendants resisted any change of course.[1] For instance, when Ernst and Young (LPHI's outside auditors) informed Pardo that it could not sign off on LPHI's financial disclosures due to its belief that LPHI's accounting practices were not in compliance with GAAP, Pardo did not respond by investigating the validity of Ernst and Young's observations. Instead, Pardo authored an email in which he threatened to sue his own auditor unless it signed off on LPHI's accounting methods.

The egregiousness of Defendants conduct is further underscored by Defendants' histories of misconduct. For instance, in 1991, Defendant (and current LPHI CEO) Brian Pardo settled a case brought against him by the Commission. In so doing, Pardo assented to the entry of a permanent injunction against him which prohibited him from ever again violating Section 13a of the of the Exchange Act. (Dkt. No. 293, Ex. B). More recently, in 2007, Life Partners settled a lawsuit filed by Colorado securities regulators alleging, among other things, that Defendants use of materially short LE's violated Colorado securities laws. (Dkt. No. 293, Ex. G–141).

Despite Pardo and his companies' history of securities issues, Life Partners exhib-

ited—at best—a casual attitude toward ensuring that it followed the law.

Given Pardo's history with securities regulators, one would think that Pardo would have been especially cautious when it came to matters of compliance with the nation's securities laws. If, perhaps, Pardo had grown careless along the way, Life Partners' ouster from the Colorado market after the company settled a bevy of charges against it filed by Colorado securities regulators should certainly have alerted Pardo and the Life Partners management team (as well as the company's Board of Directors) of a need to strengthen its oversight and compliance regime. As CEO and controlling shareholder, Pardo had the power to make these things happen. The evidence, however, shows that oversight and compliance at Life Partners were non-existent.

Consider the testimony of Tad Ballantyne. Mr. Ballantyne was and remains a director of LPHI. He also has served as the head of the company's risk and compliance committee, a fact that makes the testimony he gave all the more remarkable.

At trial, Ballantyne testified—under oath—that he had never read, seen, or even heard of a *The Wall Street Journal* story which dissected Life Partners' business practices and questioned not only the fundamentals of its business practices, but also raised the question of whether Life Partners was systematically defrauding its retail investors.[2] (1–29–14p.m. Tr., pp. 117–

---

1. The Court did not set aside the jury's Section 17 verdict aside on account of a lack of evidence that Defendants had committed securities fraud. Instead, the Court was forced to set the jury's finding aside because the Commission had limited its allegations to a very specific period of time and the evidence the SEC presented did not support a finding that Defendants had committed securities

fraud *during the specific time alleged.* The record did indeed contain evidence that Defendants knowingly—or at least recklessly—violated the securities laws of this nation.

2. The article, titled *"Odds Skew Against Investors in Bets on Strangers' Lives",* appeared in the December 21, 2010 issue of *The Wall Street Journal.* Coming in at 2,097 words and

119). When the SEC's counsel asked Ballantyne to explain how he could have completely missed such an important story, Mr. Ballantyne explained that he does not regularly read *The Wall Street Journal*, or even industry publications covering Life Partners' business. (*Id.* at pp. 104–130).

Many months have passed since the Court witnessed Ballantyne's testimony—he also testified that he was completely unaware that Ernst & Young required Pardo to retract public statements falsely claiming the firm had audited Dr. Cassidy's LEs—yet the Court continues to marvel at what it heard.

As controlling shareholder and CEO of LPHI, Brian Pardo had and continues to have the power to hand pick which distinguished citizens to entrust with the responsibility of serving as Directors of LPHI. At one point, Life Partners was a very hot company (it traded well above $20 a share before the financial crisis hit in 2008). Undoubtedly, there were scores of qualified, diligent citizens who would have jumped at the chance to serve as an LPHI director. Mr. Pardo apparently ignored them all. Instead, he chose Tad Ballantyne—a man whose testimony revealed him to be either profoundly dishonest[3] or amazingly uninformed about the company whose shareholders he has a fiduciary responsibility to protect.

Just as telling, though, is the fact that, despite the embarrassing and uninformed testimony Ballantyne provided in open court during the trial, he *remains on the Board*. This is not altogether surprising. No one—not Pardo, not Peden, not the members of LPHI's Board—has been held responsible for the company's failure to abide by the law and keep the investing public fully informed. So far as the Court can tell, nothing has changed at LPHI as a result of the failures that are the subject of this case, and the Court can only assume that this is because Pardo does not want anything to change.[4] Even after all of the problems it has had with regulators and the outcome of the trial in this case, LPHI remains a company run and controlled by a man with a history of violating securities laws, and overseen by an apparently blind Board of Directors. Plainly, the Court would be naive to assume that anything will change at Life Partners absent intervention by outside forces.

For all of the above reasons, the Court agrees with the Securities and Exchange Commission that injunctive relief is appropriate in this case. Accordingly, the Court permanently enjoins LPHI, Pardo, and Peden from future violations of Section 13(a) of the Exchange Act and rules 12b–20, 13a–1 and 13a–13 thereunder. The Court additionally permanently enjoins Pardo from violating Exchange Act Rule 13a–14.

### B. *LPHI Must Disgorge $27 million.*

The SEC next asks the Court to order LPHI (along with the individual Defendants) to disgorge its ill-gotten gains.

---

**3.** Everyone else at LPHI appears to have read that mornings *Journal* since by 9:21 a.m. E.S.T. on the morning the article in question appeared, Defendant Pardo had authored and published (via Business Wire) an open letter to investors attempting to refute the allegations made in the *Journal* piece.

**4.** Pardo continues to hold a 51% stake in LPHI.

accompanied by elaborate graphics revealing that 81.3% of LE's issued by Life Partners over a three period lived beyond Life Partners' prediction, the *Journal* article in question stated, matter of factly, that "in policies old enough to provide a measure, the insured people usually hadn't died within the life expectancy Life Partners gave its clients, and often were living beyond double or triple their projected span."

"The District Court has broad discretion not only in determining whether or not to order disgorgement but also in calculating the amount to be disgorged." *SEC v. Huffman,* 996 F.2d 800, 802 (5th Cir.1993); *see also SEC v. AMX, Int'l, Inc.,* 7 F.3d 71, 73 (5th Cir.1993); *SEC v. AmeriFirst Funding, Inc.,* 2008 U.S. Dist. LEXIS 36782 (N.D.Tex.2008); *SEC v. Reynolds,* 2008 U.S. Dist. LEXIS 65669 (N.D.Tex.2008). The law does not require precision in determining the amount of disgorgement. Rather, "disgorgement need only be a reasonable approximation of profits causally connected to the violation." *Id.; see also Allstate Ins. Co. v. Receivable Fin. Co. LLC,* 501 F.3d 398, 413 (5th Cir.2007) ("In actions brought by the SEC involving a securities violation, 'disgorgement need only be a reasonable approximation of profits causally connected to the violation.' ").

Once the Commission presents evidence reasonably approximating the amount of ill-gotten gains, the burden of proof shifts to Defendants. *See SEC v. ConnectAJet.com, Inc.,* 2011 U.S. Dist. LEXIS 130215, 2011 WL 5509896, at *7 (N.D.Tex. Nov. 9, 2011); *AmeriFirst Funding, Inc.,* 2008 U.S. Dist. LEXIS at *4; *S.E.C. v. First City,* 890 F.2d 1215, 1232 (D.C.Cir.1989); *see also SEC v. Hughes Capital Corp.,* 917 F.Supp. 1080, 1085 (D.N.J.1996), *aff'd,* 124 F.3d 449 (3rd Cir.1997). Defendants are then "obliged clearly to demonstrate that the disgorgement figure [is] not a reasonable approximation." *First City,* 890 F.2d at 1232; *see also Reynolds,* 2008 U.S. Dist. LEXIS at *7; *SEC v. Benson,* 657 F.Supp. 1122, 1133 (S.D.N.Y.1987). In determining an approximate amount of ill-gotten profits, "the risk of uncertainty should fall on the wrongdoer whose illegal conduct created the uncertainty." *Hughes,* 917 F.Supp. at 1085; *SEC v. Strauss,* 2011 WL 1158783, 2011 U.S. Dist. LEXIS 38248 (N.D.Miss. 2011). "[D]oubts are to be resolved against the defrauding party." *SEC v. MacDonald,* 699 F.2d 47, 55 (1st Cir.1983); *see also Hughes,* 917 F.Supp. at 1085.

Disgorgement is appropriate not only in cases of fraud, but also for any violation of the securities laws. *SEC v. Rockwell Energy of Texas, LLC,* No. H-09-4080, 2012 WL 360191, at *6 (S.D.Tex. Feb. 1, 2012) (ordering disgorgement against a defendant who violated only the securities registration provisions of the federal securities laws); *see, e.g., In re Skyway Comm. Holding Corp.,* No. 8:05-bk-11953-PMG, 2011 WL 1380068, at *2 (Bankr.M.D.Fla. Apr. 6, 2011) (awarding disgorgement against an unregistered broker for violations of the registration provisions of federal securities laws); *SEC v. Martino,* 255 F.Supp.2d 268 (S.D.N.Y. 2003) (same).

In this case, the SEC asserts that the Court should order Defendants to disgorge $500 million. In support of its request, the SEC points to the testimony given by its expert witness, Larry Rubin. Specifically, Rubin testified that "Life Partners' retail investors would have been willing to pay $500 million less than they actually did if Life Partners used LEs that took into account information they had up to 2008." (*See* 1–29–14p.m. Tr., p. 10).

The Court is not satisfied that Larry Rubin's testimony supports the SEC's proposition that $500 million is a reasonable estimate of LPHI's ill gotten gains. Dr. Rubin may have been qualified to testify as an expert in this case, but at trial, counsel for LPHI succeeded in casting doubts on the accuracy of Rubin's estimate of LPHI's illicit gains.

That is not to say that the Court disagrees with the SEC's fundamental point that Life Partners unlawfully benefited from its deception (intentional or unintentional). Rubin is undoubtedly correct that LPHI's revenue would have taken a con-

siderable hit had LPI retail investors been aware that the Life Estimates LPI provided were almost certainly overly "optimistic" and that the underlying insured would likely live long past the date Life Partners predicted. Yet the task of discerning the good money from the bad—as the law requires—is exceptionally complicated in this case, and the SEC offers a meat cleaver when a scalpel is required. Such an approach is not a reasonable means of calculating how much LPHI should have to pay back.

There is also the issue of equity. LPHI and LPI effectively operate as a single entity. LPHI's revenue derived from LPI's success in convincing retail investors to purchase its life settlement products. The SEC's theory in this case is that by not telling the investing public that their LEs were coming up short at a significant rate, LPHI hid the fact that their future revenues were bound to dry up as retail investors got wise to the fact that LPI's investment products were not worth purchasing.

The Court thinks there is considerable validity to the SEC's theory. Yet if that theory is in fact true, the public investors are not the only, or even the primary, victims of Life Partners incomplete disclosures. That title belongs to the retail investors who, based on LPHI's representations to them, purchased investment products at dramatically inflated prices. Certainly, the investors were deprived of important information. That said, those who owned stock while LPI's retail investors were still buying policies (since they didn't know how inaccurate LPI's LEs were) obtained a windfall on the backs of LPI retail customers' ignorance. It was only later, when the music finally stopped, that investors finally suffered an injury as a consequence of LPHI's faulty disclosures. Given this fact, to order Life Partners to disgorge $500 million to be repaid solely to shareholders would be neither justified nor just.

■ In light of the facts and issues explored above, the Court believes the appropriate course is to settle on a figure sufficiently large to deter future violators but not so large that the Court overcompensates investors with funds of which they were never in fact deprived. As such, the Court orders Life Partners to disgorge $15 million.[5]

### C. All Defendants Must Pay a Civil Penalty

Plaintiff advocates for a third-tier penalty under the statute and requests the Court to impose penalties on the Defendants ranging from a low of $67,930,000 to a high of $1.5 billion. (Dkt. No. 293, pp. 1649).

Sections 21(d) and 21A of the Exchange Act provide three tiers of penalties applicable to Defendants who violate the Act and its rules. The first tier of penalties applicable to individuals under the Exchange Act provides that sanctions shall not exceed the greater of $6,500 for each violation occurring through March 3, 2009 [6] and $7,500 for each violation occurring after March 3, 2009,[7] or the amount of the

---

**5.** The Court believes that this figure is sufficiently large—it is more than half the current market capitalization of LPHI—to deter future wrongdoers. The Court is also confident that it does not overstate the extant of LPHI's ill gotten gains.

**6.** Adjusted tier-by-tier penalties apply to LPHI's nine false reports filed between January 16, 2007 and January 9, 2009 pursuant to 17 C.F.R. § 201.1003. App. 012–018.

**7.** Adjusted tier-by-tier penalties apply to LPHI's eight false reports filed between May 29, 2009 and January 10, 2011 pursuant to 17 C.F.R. § 201.1004. *Id.*

person's gross pecuniary gain resulting from the wrongdoing. 15 U.S.C. § 77t(d). A second-tier penalty requires that the violation "involve fraud, deceit, manipulation, or *deliberate or reckless disregard of a regulatory requirement." Id.* (emphasis added). Finally, the Exchange Act provides for third tier penalties against individual wrongdoers in an amount not to exceed the greater of $130,000 for each violation through March 3, 2009 and $150,000 for each violation after that date, or the amount of the wrongdoer's gross pecuniary gain. *Id.* To trigger third tier penalties, a defendant's wrongdoing must involve the same sort of fraud or disregard required by the second tier and must have caused substantial losses—or at least the risk of substantial losses—to others. *Id.*

██ Civil penalties are designed to punish the individual violator and deter future violations of the securities laws. *SEC v. Kenton Capital, Ltd.,* 69 F.Supp.2d 1, 17 (D.D.C.1998); *SEC v. Moran,* 944 F.Supp. 286, 296 (S.D.N.Y.1996). And while the statutory tier determines the range of maximum penalties allowed per violation, the actual amount of the penalty to be imposed is left to the Court's discretion. *See SEC v. Kern,* 425 F.3d 143, 153 (2d Cir.2005); *SEC v. Universal Express, Inc.,* 646 F.Supp.2d 552, 567 (S.D.N.Y.2009).

██ In determining whether a civil penalty is appropriate and, if so, in what amount, courts consider: "(1) the egregiousness of the defendant's conduct; (2) the degree of the defendant's *scienter;* (3) whether the defendant's conduct created substantial losses or the risk of substantial losses to other persons; (4) whether the defendant's conduct was isolated or recurrent; (5) whether the defendant has admitted wrongdoing; and (6) whether the penalty should be reduced due to the defendant's demonstrated current and future financial condition." *SEC v. Razmilovic,* 822 F.Supp.2d 234 (E.D.N.Y.2011); *SEC v.*

*Colonial Inv. Mgmt. LLC,* 659 F.Supp.2d 467, 503 (S.D.N.Y.2009).

With the exception of the sixth factor (financial hardship), the Court has already addressed each of the factors relevant to determining what (if any) civil penalty is appropriate during its discussion of whether injunctive relief is appropriate. To summarize, Defendants committed serious violations of the nation's securities laws and the evidence more than suffices to establish that their conduct was—at the very least—reckless. The company and its officers have a history of run ins with securities regulators and Defendants ignored numerous red flags that ought to have lead them to investigate Life Partners' business practices to ensure that the company was fully complying with its legal obligations.

Defendants conduct plainly created a risk of substantial losses in its investors since Life Partners deprived investors of information necessary to properly value the company. The Court is not particularly concerned that Defendants have not shown "remorse" in the traditional sense, but it does note that Life Partners has apparently not made any changes to the core group of leaders who were responsible for the violations that are the subject of this litigation.

Finally, Defendants have not proffered any evidence that they cannot pay second tier penalties.

██ Turning now to Defendant Peden, the Court assesses civil penalties against him based on his rendering knowing and substantial assistance in LPHI's filing of seventeen separate, false reports as discrete violations of four separate provisions of the Exchange Act: Section 13(a), Rule 12b–20, Rule 13a–l, and Rule 13a–13, for a total of 68 individual violations. The evidence in this case supports a finding of recklessness on Peden's part and conse-

quently, the Court would be justified in assessing a second tier low max penalty of $4,740,000.00 against him. Yet the Court thinks this figure too high. While Peden is certainly culpable, the evidence quite clearly demonstrated that Peden had far less control over LPHI's businesses practices than Pardo, and he was paid considerably less than Pardo. Peden also does not have the history of violating securities laws as does Pardo. Accordingly, to assess such a large monetary penalty against Peden in this case would not be equitable. As such, the Court will exercise its discretion and reduce the figure listed above to $2,000,000.00.

■■■ Mr. Pardo is another story. Brian Pardo owns a controlling stake in LPHI and serves as its CEO. He and he alone possesses the power to make strategic decisions, and it was he who guided the company down the path it took despite numerous warning signs that doing so might entail violating the law. Likewise, Pardo has a history of violating securities laws that dates back to 1991. He is a repeat offender who shows no signs that he has learned his lesson. The evidence suggests that Pardo behaved recklessly, which calls for the assessment of a second tier penalty. Accordingly, the Court assesses civil penalties against him based on his rendering knowing and substantial assistance in LPHI's filing of seventeen separate, false reports, and his knowingly false certifications thereof, as discrete violations of five separate provisions of the Exchange Act: Section 13(a), Rule 12b–20, Rule 13a–1, Rule 13a–13, and Rule 13a–14, for a total of 85 individual violations. Based on these violations, the Court orders Defendant Pardo to pay a second tier penalty of $6,161,843.00. This figure represents the second tier low max penalty of $5,922,000 plus the $239,843 that Pardo extracted from the company to pay for country club dues and expenses, a company car, hangar space for his private air-

plane, cell phone usage for himself and his family members, a personal home computer, and family member's tuition and books between March 1, 2007 and February 28, 2011 (LPHI had to restate its financials for this entire period. (*See* Ex. G–74, p. 17; Ex. G–75, App. 062)).

Companies are also subject to three tiers of penalties for violations of the Exchange Act. 15 U.S.C. § 77t(d). While the thresholds for establishing that a particular penalty is warranted are the same for companies and individuals, the amount of penalties assessed against companies in each tier is higher. *Id.* The Exchange Act provides for first, second, or third-tier sanctions against LPHI—based on each violation of the Exchange Act through March 3, 2009—of the greater of $65,000, $325,000, or 650,000, respectively, or the amount of LPHI's gross pecuniary gain resulting from wrongdoing. *Id.;* 17 C.F.R. § 201.1003. For each violation after March 3, 2009, LPHI can be sanctioned the greater of $75,000, $375,000, or $725,000 in the first, second, or third tier, or the amount of its gross pecuniary gain. 17 C.F.R. § 201.1004.

As with the individuals, the Court deems the evidence adduced sufficient to support the imposition of second tier penalties. Based on LPHI's filing of seventeen separate, false reports as discrete violations of four separate provisions of the Exchange Act: Section 13(a), Rule 12b–20, Rule 13a–1, and Rule 13a–13, for a total of 68 individual violations, the Court orders LPHI to pay a full second tier low max penalty of $23,700,000.00.

### D. *Insufficient Evidence Exists to Trigger SOX 304's Re-imbursement Requirement*

The Commission charged Pardo with failing to reimburse LPHI certain bonus, incentive, and equity-based compensation

he received in connection with his employment for the company ("SOX Compensation") as required by Section 304 ("SOX 304") of the Sarbanes–Oxley Act of 2002 ("SOX"). *See* Doc. 67 at p. 55–56.

SOX 304 creates a right on behalf of an issuer of securities—enforceable solely by the Commission—to obtain reimbursement of SOX Compensation from the issuer's chief executive officer ("CEO"), among others. 15 U.S.C. § 7243. Congress enacted SOX as a tool for reining in corporate fraud, and it imposes a number of important disclosure and control-related duties on corporate officers and their companies. For instance, SOX Section 302— implemented as Rule 13a–14 of the Securities and Exchange Act of 1934 ("Exchange Act")—requires senior executives to certify, in every annual or quarterly report an issuer files with the Commission, that they have reviewed the report, that it does not contain any false or misleading statements or omissions of material fact, and that it fairly states the issuer's financial condition. *See* 15 U.S.C. § 7241; 17 C.F.R. § 240.13a–14. The jury found that Pardo violated this rule. *See* Doc. 258, p. 7.

SOX 304 operates as an enforcement tool for the provisions of Rule 13a–14. *See* 15 U.S.C. § 7243(a). SOX 304 unambiguously requires CEs and CFOs to reimburse their issuer for any bonuses, incentive-based compensation, and equity-based compensation received in the 12 months "following the first public issuance or filing with the Commission (whichever first occurs) of the financial document embodying such financial reporting requirement." (Dkt. No. 157, p. 10–11).

To successfully invoke Pardo's reimbursement requirement under SOX 304, the SEC must demonstrate by a preponderance of evidence that (1) LPHI was required to prepare an accounting restatement due to material no-compliance with financial reporting requirements; (2) that the non-compliance was caused by misconduct within LPHI; and (3) that Pardo received bonuses, incentive based or equity based compensation, or profits from sales of LPHI's securities during the twelve month period after the first improper public issuance of filing.

In this case, there is no question that LPHI restated its financials due to material non-compliance or that Pardo received incentive based compensation during the relevant period. However, there is insufficient evidence that LPHI's restatement was caused by misconduct. The SEC never argued that LPHI's auditors, Ernst and Young conspired with LPHI to mislead the public. Yet the SEC has also not presented evidence that LPHI did not rely on its auditor in good faith or that LPHI mislead its auditors. Instead, the evidence merely shows that up until Ernst and Young changed course, they signed off on LPHI's findings. LPHI responded aggressively to Ernst and Young's change of heart, but this fact alone does not demonstrate that Life Partners restatements were not tied to good faith reliance on the mistakes of its external auditor. Therefore, Pardo is not required to pay anything back under SOX 304.

## III. CONCLUSION

*For the reasons set out above:*

- The Court **ORDERS** that Defendant LPHI and its agents, servants, employees, attorneys, and all persons in active concert or participation with them who receive actual notice of this Final Judgment by personal service or otherwise are permanently restrained and enjoined from violating, directly or indirectly, Section 13(a) of the Exchange Act [15 U.S.C. § 78m(a)] and Rules 12b–20, 13a–1, and 13a–13 thereunder [17 C.F.R. §§ 240.12b–20, 240.13a–1, and

240.13a–13] by filing forms with the Commission containing false statements of material fact or failing to include material information that is necessary to make the statements not misleading, unless Defendants act in good faith and do not directly or indirectly induce the act or acts constituting the violation.

- The Court also **ORDERS** that Defendants Pardo and Peden, and their agents, servants, employees, attorneys, and all persons in active concert or participation with them who receive actual notice of this Final Judgment by personal service or otherwise are permanently restrained and enjoined from aiding and abetting any violation of Section 13(a) of the Exchange Act [15 U.S.C. § 78m(a)] and Rules 12b–20, 13a-1, and 13a–13 [17 C.F.R. §§ 240.12b–20, 240.13a–1, and 240.13a–13] by knowingly providing substantial assistance to an issuer that fails to file timely with the Commission all accurate and complete information, documents, and reports required by the rules and regulations prescribed by the Commission.

- The Court **ORDERS** that Defendant Pardo and his agents, servants, employees, attorneys, and all persons in active concert or participation with them who receive actual notice of this Final Judgment by personal service or otherwise are permanently restrained and enjoined from violating, directly or indirectly, Rule 13a–14 of the Exchange Act [17 C.F.R. § 240.13a–14], by using any means or instrumentality of interstate commerce, or of the mails, or of any facility of any national securities exchange to include a false and misleading certification with any annual or quarterly report required to be filed with the Commission pursuant

to Section 13(a) of the Exchange Act [15 U.S.C. § 78m(a)].

- The Court further **ORDERS** Life Partners to Disgorge $15,000,000.00. Defendant shall satisfy this obligation by transiting payment for this sum to the Securities and Exchange Commission within 14 days after the entry of this Final Judgment.

- The Court finally **ORDERS** Defendant Life Partners to pay a Civil Penalty of $23,700,000.00. Life Partners shall satisfy this obligation by transmitting payment for this sum to the Securities and Exchange Commission within 14 days of entry of this Final Judgment.

- The Court **ORDERS** Defendant Peden to Pay a Civil Penalty of $2,000,000.00. Peden shall satisfy this obligation by transmitting payment for this sum to the Securities and Exchange Commission within 30 days of entry of this Final Judgment.

- The Court **ORDERS** Defendant Pardo to Pay a Civil Penalty of $6,161,843.00. Pardo shall satisfy this obligation by transmitting payment for this sum to the Securities and Exchange Commission within 30 days of entry of this Final Judgment.

**IT IS FURTHER ORDERED** that all relief not expressly granted is hereby **DENIED.**

**IT IS FINALLY ORDERED** that this action is hereby **CLOSED.**