**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

<table>
<tr><td>

U.S. SECURITIES &
EXCHANGE COMMISSION,
   *Plaintiff-Appellant*,

v.

PETER L. JENSEN;
THOMAS C. TEKULVE, JR.,
   *Defendants-Appellees.*

</td><td>

No. 14-55221

D.C. No.
2:11-cv-05316-R-AGR

OPINION

</td></tr>
</table>

Appeal from the United States District Court
for the Central District of California
Manuel L. Real, District Judge, Presiding

Argued and Submitted February 10, 2016
Pasadena, California

Filed August 31, 2016

Before: Jerome Farris, Richard R. Clifton,
and Carlos T. Bea, Circuit Judges.

Opinion by Judge Clifton;
Concurrence by Judge Bea

## SUMMARY[*]

### Securities and Exchange Commission

The panel vacated the district court's judgment in favor of defendant-corporate officers of the now-defunct Basin Water, Inc., in an enforcement action filed by the Securities and Exchange Commission ("SEC") alleging that the defendants participated in a scheme to defraud Basin investors by reporting millions of dollars in revenue that were never realized; and remanded for further proceedings.

The panel reversed the district court's rulings interpreting Rule 13a-14 of the Securities Exchange Act and Section 304 of the Sarbanes-Oxley Act. The panel held that Rule 13a-14 provided the SEC with a cause of action not only against Chief Executive Officers and Chief Financial Officers who did not file the required certifications, but also against CEOs and CFOs who certified false or misleading statements. The panel further held that the disgorgement remedy authorized under Section 304 of the Sarbanes-Oxley Act applied regardless of whether a restatement was caused by the personal misconduct of an issuer's CEO and CFO or by other issuer misconduct.

The panel reversed the district court's bench trial order, vacated the judgment, and remanded for a jury trial. The panel held that the SEC was entitled to a jury trial and did not consent to defendant officers' withdrawal of their jury demand. The panel also held that the SEC did not waive its

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

right to a jury trial when it objected consistently and repeatedly before trial to the district court's decision to hold a bench trial.

The panel approved the district court's grant of defendants' motion in limine to exclude evidence about the SEC injunction against Basin's Director of Finance because the evidence was both unfairly prejudicial and not particularly probative.

Judge Bea generally concurred in the panel's analysis and disposition, but wrote separately to clarify the intended scope of the new legal rules announced in the panel's opinion.

## COUNSEL

Paul G. Alvarez (argued), Senior Counsel; Benjamin L. Schiffrin, Senior Litigation Counsel; Jacob H. Stillman, Solicitor; Michael A. Conley, Deputy General Counsel; U.S. Securities & Exchange Commission, Washington, D.C.; for Plaintiff-Appellant.

David C. Scheper (argued), William H. Forman, and Annah S. Kim, Scheper Kim & Harris, Los Angeles, California, for Defendant-Appellee Peter L. Jensen.

Seth Aronson (argued), Carolyn Kubota, and Alec Johnson, O'Melveny & Myers, Los Angeles, California, for Defendant-Appellee Thomas C. Tekulve, Jr.

**OPINION**

CLIFTON, Circuit Judge:

The Securities and Exchange Commission appeals from a district court judgment in favor of Peter Jensen and Thomas Tekulve, the former Chief Executive Officer and Chief Financial Officer of the now-defunct Basin Water, Inc. The SEC filed suit against Defendants in 2011 alleging that they had participated in a scheme to defraud Basin investors by reporting millions of dollars in revenue that were never realized. The district court granted partial summary judgment to Defendants on the SEC's claim under Rule 13a–14 of the Securities Exchange Act (Exchange Act), which requires that an issuer's CEO and CFO certify the accuracy of the issuer's financial reports. 17 C.F.R. § 240.13a–14. The court held that the rule requires CEOs and CFOs to certify certain financial statements but does not provide a cause of action against officers who certified false statements. The court held a bench trial on the SEC's remaining claims and found for Defendants on all counts.

On appeal, the SEC challenges the district court's grant of partial summary judgment, its grant of Defendants' motion to withdraw their demand for a jury trial, its decision to exclude evidence at trial about a 1995 SEC injunction against Basin's Director of Finance, and the substance of several factual findings and legal conclusions the court reached at trial. Among the legal conclusions challenged is the district court's interpretation of Section 304 of the Sarbanes-Oxley Act (SOX 304). *See* 15 U.S.C. § 7201 *et seq*. The district court held that SOX 304 requires CEOs and CFOs to disgorge incentive- and equity-based compensation if their companies issue an accounting restatement because of the officers' own

misconduct, but not if the restatement was caused by issuer misconduct in which the officers were not directly involved.

We reverse the district court's rulings interpreting Exchange Act Rule 13a–14 and SOX 304. Rule 13a–14 provides the SEC with a cause of action not only against CEOs and CFOs who do not file the required certifications, but also against CEOs and CFOs who certify false or misleading statements. The disgorgement remedy authorized under SOX 304 applies regardless of whether a restatement was caused by the personal misconduct of an issuer's CEO and CFO or by other issuer misconduct.

We also reverse the district court's bench trial order, vacate the judgment, and remand for a jury trial. The SEC was entitled to a jury trial and did not consent to Jensen and Tekulve's withdrawal of their jury demand. Nor did the SEC waive its right to a jury trial when it objected consistently and repeatedly before trial to the district court's decision to hold a bench trial.

Anticipating that the issue may arise again on remand, we approve the district court's grant of Defendants' motion in limine to exclude evidence about the injunction against Basin's Director of Finance.

The judgment of the district court is vacated and the case is remanded for further proceedings.

## I. Background

Peter Jensen founded Basin Water in 1999 to manufacture water treatment units that would provide municipalities with clean drinking water. In 2004, Jensen hired Thomas Tekulve

as CFO. Tekulve created a finance and accounting department at Basin and put in place accounting procedures and internal controls intended to position the company to go public,[1] which it did in May 2006.

The SEC alleges that, beginning in Basin's first quarter as a public company and ending with the end of the 2007 fiscal year, Jensen and Tekulve engaged in a scheme to fraudulently overstate the company's financial results. The alleged scheme involved what the SEC viewed as Basin's failure to comply with Generally Accepted Accounting Principles

---

[1] Public reporting companies (with the exception of some foreign issuers) are required to prepare their publicly filed financial statements in accordance with Generally Accepted Accounting Principles (GAAP) (though they may also prepare additional reports using non-GAAP principles). *See, e.g.*, 15 U.S.C. § 78m; 17 C.F.R. § 229.10 (providing that, if a publicly registered company chooses to present non-GAAP financial measures, it must include a "presentation, with equal or greater prominence, . . . of the most directly comparable financial measure or measures calculated and presented in accordance with Generally Accepted Accounting Principles (GAAP) . . . ."); 17 C.F.R. § 229.601(b)(31) (requiring CEOs and CFOs to certify, in accordance with Rule 13a–14, "exactly" as follows: "The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures . . . and internal control over financial reporting . . . and have . . . [among other things] [d]esigned such internal control over financial reporting . . . to provide reasonable assurance regarding the reliability of financial reporting and *the preparation of financial statements for external purposes in accordance with generally accepted accounting principles* . . . ." (emphasis added)). Since 1973, the SEC has entrusted the maintenance of GAAP to the Financial Accounting Standards Board, which periodically updates or revises GAAP in light of new accounting and legal developments. However, "GAAP is not the lucid or encyclopedic set of pre-existing rules . . . . Far from a single-source accounting rulebook, GAAP 'encompasses the conventions, rules, and procedures that define accepted accounting practice at a particular point in time.'" *Shalala v. Guernsey Mem'l Hosp.*, 514 U.S. 87, 101 (1995).

(GAAP) in financial reports to the SEC. The agency pointed to two general types of transactions that it viewed as violating GAAP: (1) Basin recognized revenue from sales that were contingent or had not yet been finalized, and (2) Basin recognized sales revenue from loans made to Special Purpose Entities (SPEs), which used that money to purchase water treatment units from Basin with no reasonable expectation that the SPEs would ever repay such loans. In its complaint, the SEC also alleged that Jensen and Tekulve each received several hundred thousand dollars of incentive-based compensation, in the form of salary and bonuses, and equity-based compensation, in the form of shares of Basin stock, during the period in which they were allegedly causing Basin to inflate its revenues fraudulently. The complaint also asserted that Jensen had sold his Basin stock based on material nonpublic information, realizing some $9,000,000 in profit.

After Jensen and Tekulve left the company in 2008, Basin restated its financial statements for 2006 and 2007. Basin's stock price fell substantially after the company's announcement that restatement might be necessary.

Thereafter, the SEC brought this enforcement action against Jensen and Tekulve. In November 2012, the district court granted partial summary judgment for Defendants on the SEC's claims under Exchange Act Rule 13a–14 and denied all other motions and cross-motions for summary judgment. After a bench trial beginning on October 15, 2013, the district court found in favor of the defendants on all remaining counts, concluding that "revenue was properly recognized" on all the transactions at issue, and that they "had economic substance." The court also found that the SEC had

failed to show that Jensen had sold any of his Basin shares in reliance on insider information.  This appeal followed.

## II.  The SEC's entitlement to a jury trial

Because it affects the largest number of issues, we start by taking up the question of whether the SEC was improperly denied a jury trial.  We review entitlement to a jury trial de novo.  *Palmer v. Valdez*, 560 F.3d 965, 968 (9th Cir. 2009).  We conclude that the issues should have been tried to a jury, that the district court erred in proceeding with a bench trial, and that the results of that bench trial must be vacated.

### A.  The right to a jury trial

As a preliminary issue, we note that the SEC had a right to a jury trial on most of its claims against Defendants. Parties have a right to a jury trial in lawsuits seeking legal remedies.  Legal remedies are distinct from equitable remedies in that they are "intended to punish culpable individuals, as opposed to those intended simply to extract compensation or restore the status quo."  *Tull v. United States*, 481 U.S. 412, 422 (1987).

Although much of the relief sought by the SEC was equitable, for which there is not a right to a jury, the SEC requested legal relief in the form of civil penalties for six of the seven claims asserted in its complaint.[2]  *See* 15 U.S.C.

---

[2] The claimed violations arose under the following provisions of the Securities and Exchange Acts: (1) Section 17(a) of the Securities Act (fraud); (2) Section 10(b) of the Exchange Act and Exchange Act Rule 10b–5 (fraud); (3) Section 13(a) of the Exchange Act and Exchange Act Rules 12b–20, 13a–1 and 13a–13 (failure to include material information

§ 77t(d) (granting the SEC the power to seek civil penalties for violations of the Securities Act); 15 U.S.C. § 78u(d) (granting the SEC the power to seek civil penalties for violations of the Exchange Act). For only one claim did the SEC request exclusively equitable relief. That was for a claim, identified as Claim Seven, which arose under Section 304 of the Sarbanes-Oxley Act (SOX 304). *See SEC v. Jasper*, 678 F.3d 1116, 1130 (9th Cir. 2012) ("Ninth Circuit law is clear that the reimbursement provision of SOX 304 is considered an equitable disgorgement remedy and not a legal penalty.").

That the SEC, in addition to seeking civil penalties, also requested equitable relief for Claims One through Six does not undercut its entitlement to a jury. Where, as here, "a 'legal claim is joined with an equitable claim, the right to jury trial on the legal claim, including all issues common to both claims, remains intact.'" *Tull*, 481 U.S. at 425.

### B. The SEC did not waive its right to a jury trial

The SEC did not request a jury trial in its complaint. Rather, the first party to request trial by jury was Tekulve, whose answer to the SEC's complaint included a jury demand "as to all issues which are triable by jury." Accordingly, the district court entered an order on December 8, 2011 setting the case for a jury trial.

---

on annual and quarterly reports); (4) Section 13(b)(5) of the Exchange Act and Exchange Act Rule 13b2–1 (falsifying books and records); (5) Exchange Act Rule 13b2–2 (making false statements to accountants); (6) Exchange Act Rule 13a–14 (false certification), and (7) Sarbanes-Oxley Section 304 (violation of financial reporting requirements).

Almost a year and a half later, on March 29, 2013, Jensen and Tekulve filed a notice withdrawing the jury demand and waiving their right to a jury trial. The SEC responded on the same day by filing a response stating its lack of consent to the withdrawal of the jury trial demand, noting that Defendants' filing did not comply with Rule 38(d) of the Federal Rules of Civil Procedure (which requires all parties to consent to the withdrawal of a jury demand), and asking the court to disregard Defendants' notice.

Despite the SEC's objection, the court granted Defendants' request and set the case for a bench trial, reasoning that "only the defendants timely requested a jury trial." The court's order was dated April 1, 2013, but due to a error by the clerk's office it was not docketed or served until June 4, 2013.

The SEC did not state any further objection on the record until the parties' jointly proposed Amended Final Pretrial Conference Order, submitted on September 5, 2013, in which the SEC again requested that the case be tried by a jury. At the pretrial conference a few days later, the district court reiterated its intention to hold a bench trial because the SEC "didn't ask for a jury trial in the first place."

This decision was erroneous. The rules provide that a jury demand can be withdrawn "only if the parties consent." Fed. R. Civ. P. 38(d). It does not matter whether the party that filed for waiver was the same party that demanded a jury in the first place; other parties "are entitled to rely" on the original jury demand, "and need not file their own demands." *Fuller v. City of Oakland*, 47 F.3d 1522, 1531 (9th Cir. 1995). Moreover, the Federal Rules provide a specific procedure for withdrawal of a jury demand: As long as there is a federal

right to a jury trial, "trial on all issues so demanded must be by jury unless . . . the parties or their attorneys file a stipulation to a nonjury trial or so stipulate on the record." Fed. R. Civ. P. 39(a). It is uncontested that the SEC did not so stipulate here. To the contrary, the SEC stated its objection to a bench trial multiple times, beginning on the very same day that Defendants purported to withdraw the jury demand.

In its Findings of Fact and Conclusions of Law after trial, the district court repeated its position that a bench trial was appropriate, but by that point its reasoning had changed. The court concluded, and Defendants argue on appeal, that the SEC waived its right to a jury trial by failing to object to the district court's order setting the case for a bench trial between June 4, 2013, when the agency received notice of the order, and September 5, 2013, when it filed its Amended Pretrial Conference Order.

We have recognized a limited exception to the requirements of Rules 38 and 39 "when the party claiming the jury trial right is attempting to act strategically—participating in a bench trial in the hopes of achieving a favorable outcome, then asserting lack of consent to the bench trial when the result turns out to be unfavorable for him." *Solis v. Cty. of Los Angeles*, 514 F.3d 946, 955 (9th Cir. 2008). However, this exception is narrow. "Because the right to a jury trial is a fundamental right guaranteed to our citizenry by the Constitution, . . . courts should indulge every reasonable presumption against waiver." *Id.* at 953 (quoting *Pradier v. Elespuru*, 641 F.2d 808, 811 (9th Cir. 1981)). "Reluctant participation in a bench trial does not waive one's Seventh Amendment right to a jury trial." *Id.* at 956.

In *White v. McGinnis*, 903 F.2d 699 (9th Cir. 1990), we found waiver where the appellant "sat through the entire bench trial and never once objected to the absence of a jury while his counsel vigorously argued his case to the judge." *Id.* at 700. "Nor did appellant notify the court of its mistake before it entered judgment against him." *Id.* "Nor did he file a motion for a new trial after judgment." *Id.* This case is nothing like that. Here, the SEC maintained the consistent position that it did not consent to the withdrawal of the jury demand, beginning on the day the demand withdrawal was filed. It then stated its objection to the court's order setting the matter for bench trial more than a month before trial. A few days before trial commenced, the SEC submitted proposed jury instructions. This is a far cry from the type of "vigorous participation in a bench trial, without so much as a mention of a jury" that we have previously held to constitute waiver. *White*, 903 F.2d at 703. The SEC's repeated objections prior to trial preserved its right to contest the district court's erroneous bench trial order.

## C.  *The district court's error was not harmless*

Even though we have concluded that the district court erred in conducting a bench trial, Defendants argue that remand for a jury trial is not necessary because the error in denying the SEC a jury trial was harmless. "The denial will be harmless only if 'no reasonable jury could have found for the losing party, and the trial court could have granted a directed verdict for the prevailing party.'" *Solis*, 514 F.3d at 957 (quoting *Fuller*, 47 F.3d at 1533). "If reasonable minds could differ as to the import of the evidence, however, a verdict should not be directed." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250–51 (1986). We conclude that a directed verdict would not have been appropriate based on the

evidence offered in this case, so the erroneous denial of a jury trial was not harmless.

The SEC's claims focused generally on Basin's transactions with a group of investors called Opus Trust, a company called Thermax, and two Special Purpose Entities (SPEs). With regard to each of the six transactions at issue in this case, the district court resolved key issues of fact in favor of Defendants that a jury could have resolved in the SEC's favor. This is particularly clear in the context of the district court's credibility determinations, which are "the exclusive function of the jury." *Donoghue v. Orange Cty.*, 848 F.2d 926, 932 (9th Cir. 1987). The court discounted the testimony of three of the SEC's fact witnesses outright,[3] some of whom

---

[3] The court discounted the testimony of James Sabzali, Lloyd Ward, and Michael Stark. Sabzali's testimony was discounted on the ground that he lied about a prior felony conviction and was impeached at trial, as well as on the basis of his general "demeanor and attitude during his testimony." The court gave "little weight" to the testimony of Lloyd Ward (the attorney who set up the SPE deals) due to Lloyd's demeanor and attitude, as well as evidence that Ward had committed numerous recent legal and ethical violations: His license to practice law had been suspended for eleven months as of the date of trial; he admitted that he was subject to a 2011 cease and desist order by the Connecticut Banking Commission for providing illegal debt relief services and had been ordered to pay a $500,000 fine; and he was subject to a final judgment in Kansas for providing illegal debt services and had been ordered to pay a $100,000 fine there. Lastly, the district court found "Stark's credibility to have been impeached" by evidence that directly contradicted his trial testimony on material issues. Stark testified that he did not have a close relationship with Charles Litt, who was involved in setting up the SPE transactions, and that Stark had never before done a deal with Litt. However, e-mail correspondence revealed that, at the time he began work at Basin, Stark had just returned from a three-week vacation in Italy with Litt and his wife. Moreover, Litt's wife was Stark's wife's cousin, and Stark had testified in his deposition that he considered Litt a member of the family.

presented testimony that materially contradicted other witnesses favorable to Defendants.**[4]** "A directed verdict is improper when there is conflicting testimony raising a question of witness credibility." *Id.*

The district court also credited statements made by other witnesses despite evidence in the record that a reasonable jury could conclude contradicted their testimony. For instance, the district court's determination that Basin properly

---

Stark was also confronted on cross-examination with a May 12, 2007 e-mail to a business colleague in which Stark identified Litt as his "financial guy who does all [his] deals."

**[4]** The court also discounted the testimony of the SEC's expert because she "did not sufficiently take into consideration the role of professional judgment in accounting for transactions and relied excessively on hindsight in evaluating the accounting issues in this case, rather than viewing the facts as they existed at the time." This determination doubtless affected the verdict, as the key issue in many of the SEC's claims was whether revenue had been properly recognized under GAAP, a subject on which the district court accepted Defendants' expert's testimony in full.

Defendants argue on appeal that, were this case tried before a jury, the district court would have been obligated to bar the jury from hearing the SEC's expert witness altogether because the court found her methodology "unreliable." It is true that "the Federal Rules of Evidence impose a 'gatekeeping' duty on the district court, requiring the court to 'screen[ ]' the proffered evidence to 'ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable.'" *United States v. Alatorre*, 222 F.3d 1098, 1100–01 (9th Cir. 2000) (quoting *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 597 (1993)). However, under this standard, the district court's critiques of the SEC's expert's methodology in its Findings of Fact and Conclusions of Law, by themselves, would not have given it proper grounds to bar the expert from testifying before a jury. We do not need to resolve this issue, because there are enough other conflicts to foreclose a directed verdict.

recognized revenue from the Opus Trust transaction was dictated by its assessment of Tekulve's credibility as a witness. In the initial letter agreement between Opus and Basin, dated December 2005, Opus agreed to purchase a five percent stake in a Basin subsidiary and two 1,000 gpm (gallons per minute) ion exchange units for a total price of $1.5 million. Basin's auditors advised the company that the revenue from that deal could not be recorded based on the letter agreement because the agreement did not specify the items sold. At trial, Tekulve testified that Basin identified the specific units sold to Opus in March 2006, at which point Basin's auditors gave their approval for the revenue to be recorded.

The district court credited Tekulve's testimony and found that the revenue from the Opus sale had been properly recorded as of March 2006. But other evidence in the record suggests that the identity of the units sold to Opus may not have been finalized until late June 2006. An e-mail sent by Tekulve on June 16, 2006 stated that Opus would have to identify for Basin's auditors that "the units [Opus] owns are the Salinas Well 06 and 20 units," which had a respective gpm of 500 and 600, but the formal purchase agreement, signed later that month, identified the units sold to Opus as Salinas Units Nos. 15 and 108, which had a gpm of 700 and 1,100. While Defendants argue that the June 16 e-mail "only notes that the [final agreement] should reflect the identity of the units sold"—essentially, that the units named were meaningless placeholders—it would not be unreasonable for a jury to read the e-mail to show that the units sold were not agreed upon until June 2006, and thus to conclude that the sale price should not have been recognized as revenue in the first quarter of 2006.

Similarly, the district court's decision to credit Jensen's testimony over potentially contradictory evidence affected its verdict on the SEC's claim that Basin prematurely recognized revenue in the Thermax transaction. In September 2006, Thermax representative James Sabzali e-mailed Jensen stating his intent to purchase two controlled softening modules from Basin. The e-mail attached a letter that included several terms and conditions (T&Cs), including an escape clause providing that Thermax's purchase order was contingent on Thermax receiving an order for controlled softening modules from PDVSA, a state-owned petroleum company in Venezuela, by November 30, 2006. Sabzali asked Jensen to confirm agreement with the T&C by reply e-mail. At trial, Sabzali testified that Jensen provided him with oral consent to Thermax's T&Cs in a later phone conversation. Jensen, in contrast, testified that he called Sabzali and told him that he would reject the offer unless Thermax sent him a non-contingent purchase order.

On September 28, 2006, Thermax's Finance Unit sent Jensen a purchase order for two controlled softening modules at a total cost of $860,320. The purchase order did not contain the T&Cs or the escape clause that had been included in Sabzali's prior e-mail, but stated only "TBA[:] Agreed that the T&C to Basin will reflect the T&C's on PDVSA's to Thermax Inc." Jensen testified that he understood this purchase order to be non-contingent. Based on this understanding, Basin began construction on the modules and, over the next four quarters, recorded revenues from the transaction totaling $642,000. Having discredited Sabzali's testimony to the contrary, the district court found that Jensen had properly rejected Thermax's T&Cs and that Basin recognized revenue in accordance with GAAP based on the

purchase order from Thermax's Finance Unit.**[5]**  But had a jury credited Sabzali's testimony instead of Jensen's, it could have concluded that collectibility was not reasonably assured on the Thermax transaction, and that as a result Basin's accounting had not complied with GAAP.

The other transactions at issue in this case involved the two SPEs, VL Capital, LLC (VLC) and Water Services Solutions (WSS), which the SEC alleged had been established at Basin's direction.  According to the SEC, the transactions Basin entered into with the SPEs were without "economic substance," because "Basin essentially paid [the SPEs] to purchase the system[s]" and then reported those purchases as revenue without reasonably expecting to receive repayment of the purchase price.  At trial, Defendants countered that the decision to recognize revenue from these transactions complied in full with GAAP because at the time it recognized revenue, Basin thought the SPEs could secure financing.

One of the requirements under GAAP is that collectibility of reported revenue is reasonably assured.  At trial,

---

**[5]** Whether Basin's recognition of revenue comported with SEC Release (Staff Accounting Bulletin) No. 104 ("SAB 104") was a significant point of contention at trial.  A Staff Accounting Bulletin is a periodic publication from the SEC that offers "interpretive guidance" regarding how the SEC thinks GAAP's broad principles (as well as applicable SEC rules and regulations) should be applied with respect to a particular accounting issue or in a particular situation.  SAB 104, 81 SEC Docket 2848, 2003 WL 22971049, at *1 (Dec. 17, 2003).  SAB 104 provides that the SEC "believes that revenue generally is realized or realizable and earned when all of the following criteria are met: [1] Persuasive evidence of an arrangement exists, [2] Delivery has occurred or services have been rendered, [3] The seller's price to the buyer is fixed or determinable, and [4] Collectibility is reasonably assured."  *Id.* at *4.

Defendants' expert testified that preliminary financing arrangements between VLC and CCH, a Danish bank, and between WSS and National City Energy Capital, an American bank, provided evidence of collectibility in the SPE transactions. The district court's conclusion that collectibility for the SPE transactions was reasonably assured relied at least in part on this testimony. But the early arrangements with CCH and National City were never finalized, and both banks dropped out of the transactions before formal contracts between Basin and the SPEs were signed. The district court did not acknowledge this, and Defendants' expert testified that it was an "important" part of the collectibility analysis that the preliminary financing arrangement with National City allowed the bank "to not fulfill [the loan] at their own discretion." Because a reasonable jury could have viewed the lack of outside financing as having undermined collectibility, a directed verdict would not have been appropriate regarding the SPE transactions.

The examples above are not intended to provide a comprehensive list of the potential issues on which a jury could reach a different result than the judge did. Rather, they point to evidence as to all transactions at issue that "presents a sufficient disagreement to require submission to a jury." *Anderson*, 477 U.S. at 251–52. Because the court could not have granted Defendants a directed verdict, the court's error in concluding that the SEC waived its right to a jury trial was not harmless. We reverse the bench trial order and remand for a jury trial. *See Solis*, 514 F.3d at 957.

*D.  Remand moots the SEC's challenges to the findings of fact*

For the most part, our decision that the order setting the case for a bench trial was erroneous moots the SEC's remaining challenges to the district court's findings of fact and conclusions of law on appeal.  As noted above, the right to a jury trial exists only for legal and not equitable claims, but the jury serves as the finder of fact for "issues common to both claims."  *Tull*, 481 U.S. at 425.  Therefore, the SEC's Claims One through Six must be tried to a jury.  This conclusion vacates the district court's findings of fact as to those claims and, on remand, the district court may consider equitable relief for Claims One through Six only "after the jury renders its verdict."  *See Beacon Theatres, Inc. v. Westover*, 359 U.S. 500, 508 (1959) (holding that in cases for both legal and equitable relief, the legal claims must be tried to a jury before the court can grant equitable relief).  To the extent that the SEC's challenges to the district court's legal conclusions depended on the court's application of the law to the facts, those challenges are moot as well.

SEC's Claim Seven for relief under SOX 304 presents a more challenging question.  As noted above, this claim requests only equitable relief, so it does not trigger the right to a jury trial.  However, it involves the same set of facts that the jury will be required to find in order to resolve Claims One through Six.  The key issue in determining Jensen and Tekulve's liability under Claim Seven, which we discuss in greater detail below, is whether Basin's restatements resulted from misconduct.  Claims One through Six all involve allegations of misconduct, including fraud, falsifying books and records, and false certification.  As a result, a finding that Jensen and Tekulve committed a violation of securities laws

under any of Claims One through Six would necessarily require the jury to consider the same issues that the court is called upon to determine in Claim Seven.

In cases that involve both legal and equitable claims, the Supreme Court has cautioned against "trying part to a judge and part to a jury." *Id.* at 508. When a plaintiff brings legal and equitable claims "based on the same facts, the Seventh Amendment requires the trial judge to follow the jury's implicit or explicit factual determinations in deciding the legal claim." *Miller v. Fairchild Industries, Inc.*, 885 F.2d 498, 507 (9th Cir. 1989). Therefore, even though it is uncontested that Claim Seven is purely equitable, it is necessary to vacate the district court's judgment as to that claim. In ruling on Claim Seven on remand, the district court "will be bound by all factual determinations made by the jury" in the process of deciding Claims One through Six. *Id.*

## III.    Rule 13a–14

Prior to trial, the district court granted summary judgment to Defendants on the claim that their certification of false financial statements violated Rule 13a–14 of the Exchange Act. The SEC challenges that decision. We review a district court's grant of summary judgment de novo. *Oswalt v. Resolute Indus., Inc.*, 642 F.3d 856, 859 (9th Cir. 2011).

Rule 13a–14 requires that for every report filed under Section 13(a) of the Exchange Act, including Form 10–Q and 10–K financial reports, each principal executive and principal financial officer of the issuer must sign a certification as to the accuracy of the financial statements within the report. 17 C.F.R. §240.13a–14. The rule was adopted in 2002, as directed by Section 302 of the Sarbanes-Oxley Act (SOX

302).  15 U.S.C. § 7241.  The rule in relevant part reads as follows:

> Each report, including transition reports, filed on Form 10–Q, Form 10–K, Form 20–F or Form 40–F . . . under Section 13(a) of the Act . . . must include certifications in the form specified in the applicable exhibit filing requirements of such report and such certifications must be filed as an exhibit to such report.  Each principal executive and principal financial officer of the issuer, or persons performing similar functions, at the time of filing of the report must sign a certification.

17 C.F.R. § 240.13a–14(a).  In accordance with SOX 302, the certification must provide, among other things, that "the signing officers . . . are responsible for establishing and maintaining internal controls," and that those controls "ensure that material information relating to the issuer . . . is made known to such officers."  15 U.S.C. § 7241(a)(4).  The signing officers are also required to certify that, "based on the officer's knowledge, the report does not contain any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which such statements were made, not misleading."  *Id.* § 7241(a)(2).

Defendants argue that this rule creates a cause of action against CEOs and CFOs who do not sign or file certifications but does not create a cause of action based on *false* certifications independent of the existing provisions in the Exchange Act that prohibit fraudulent statements.  The

district court agreed with Defendants and dismissed the SEC's Rule 13a–14 claim.

We disagree. "[S]igners of documents should be held responsible for the statements in the document." *Howard v. Everex Sys., Inc.*, 228 F.3d 1057, 1061 (9th Cir. 2000). "[T]he affixing of a signature is not a mere formality, but rather signifies that the signer has read the document and attests to its accuracy." *Id.* (quoting *United States v. Gomez-Gutierrez*, 140 F.3d 1287, 1289 (9th Cir. 1998)).

The wording of Rule 13a–14 supports the conclusion that a mere signature is not enough for compliance. The dictionary definition of "certify" is "1. to testify by formal declaration, often in writing; to make known or establish (a fact)"; or "3. to guarantee the quality or worth of; vouch for [something]." Webster's New Twentieth Century Dictionary of the English Language, Unabridged, 297 (Jean L. McKechnie ed., 2d ed. 1979). Thus, by definition, one cannot certify a fact about which one is ignorant or which one knows is false.

While we have not previously had the opportunity to define the scope of Rule 13a–14, we have in the past concluded that other, similar rules include an implicit truthfulness requirement. Rule 13a–14 is promulgated under the authority of Exchange Act Section 13(a), which requires companies to file with the SEC annual and quarterly reports as well as such "information and documents . . . as the Commission shall require to keep reasonably current the information and documents required to be included in or filed with an application or registration statement." *United States v. Berger*, 473 F.3d 1080, 1097 (9th Cir. 2007) (quoting 15 U.S.C. § 78m(a)). In *Ponce v. SEC*, 345 F.3d 722 (9th Cir.

2003), we concluded that Rule 13a–13, which is also promulgated under the authority of Section 13(a), "requires the filing of quarterly reports that are not misleading," *id.* at 735, even though the rule itself states only that issuers are required to file such reports without specifying whether they must be truthful, *see* 17 C.F.R. § 240.13a–13. We also upheld the SEC's determination that the defendant had violated Rule 13a–1, which requires issuers to file annual reports, by filing reports that contained misleading information. *Ponce*, 345 F.3d at 735–36 (quoting 17 C.F.R. § 240.13a–1).

Other circuit courts have also read rules promulgated under Section 13 to create liability for false statements even when the rules did not explicitly require truthfulness. For example, Rule 13d–1, promulgated under Exchange Act Section 13(d), requires certain stockholders to file a form called a Schedule 13D with the SEC within a certain period of time after taking possession of their stock. 17 C.F.R. § 240.13d–1. The rule does not explicitly require that the Schedule 13D be accurate. Nonetheless, in *GAF Corp. v. Milstein*, 453 F.2d 709 (2d Cir. 1971), the Second Circuit concluded that "the obligation to file *truthful* statements is implicit in the obligation to file with the issuer." *Id.* at 720. It held that Rule 13d–1 created a cause of action against a stockholder who filed a false Schedule 13D and not merely against one who failed to file a Schedule 13D altogether. In so holding, the court explicitly rejected the argument that false filings violated only "the penal provision on false filings . . . or one of the antifraud provisions" within the Exchange Act. *Id*; *see also Dan River, Inc. v. Unitex Ltd.*, 624 F.2d 1216, 1227 (4th Cir. 1980); *SEC v. Savoy Indus., Inc.*, 587 F.2d 1149, 1165 (D.C. Cir. 1978) ("Sections 13(d)(1) and

13(d)(3) and the rules promulgated thereunder undoubtedly create the duty to file truthfully and completely.").

We agree and conclude that Rule 13a–14, like other rules promulgated under Section 13 of the Exchange Act, includes an implicit truthfulness requirement. It is not enough for CEOs and CFOs to sign their names to a document certifying that SEC filings include no material misstatements or omissions without a sufficient basis to believe that the certification is accurate. We reverse the district court's decision to the contrary and remand the SEC's Rule 13a–14 claim.[6]

---

[6] We decline to reach the question of the mental state required for a violation of Rule 13a–14. The parties have not presented arguments on that issue, which confirms that a rule on mental state is not needed to resolve the case before us. Moreover, as the concurrence notes, our only precedent on this issue expressly declines to reach the question of the mental state required for a violation of a rule promulgated under Section 13. *Ponce*, 345 F.3d at 741 (noting that "in at least one proceeding the SEC has held that a scienter requirement is not necessary [for a violation of Rules 13a–1 and 13a–13] since Section 13(a) violations do not require scienter"). In addition, at least one other circuit has concluded that rules promulgated under Section 13—including rules that apply to persons and not to the issuers themselves—do not incorporate a scienter requirement. *See SEC v. McNulty*, 137 F.3d 732, 740–41 (2d Cir. 1998) (holding that there is "no scienter requirement inserted in SEC Rule 13b2–1 . . . because § 13(b) of the 1934 Act 'contains no words indicating that Congress intended to impose a 'scienter' requirement.'") (internal citations omitted). To be sure, we do not express an opinion on whether or not the standard suggested by the concurrence is correct. Rather, we recognize that this issue is not properly before us and observe the "cardinal principle of judicial restraint—if it is not necessary to decide more, it is necessary not to decide more." *Ventress v. Japan Airlines*, 747 F.3d 716, 724 (9th Cir. 2014) (Bea, J., concurring in part) (quoting *PDK Labs. Inc. v. DEA*, 362 F.3d 786, 799 (D.C. Cir. 2004) (Roberts, J., concurring in part and concurring in the judgment)).

## IV.    Sarbanes-Oxley Section 304

The SEC also raises a substantive challenge to the district court's legal analysis of Section 304 of the Sarbanes-Oxley Act, commonly referred to as SOX 304. We review de novo the district court's conclusions of law following a bench trial. *Lentini v. California Ctr. for the Arts, Escondido*, 370 F.3d 837, 843 (9th Cir. 2004).

SOX 304 provides, in relevant part:

> If an issuer is required to prepare an accounting restatement due to the material noncompliance of the issuer, as a result of misconduct, with any financial reporting requirement under the securities laws, the chief executive officer and chief financial officer of the issuer shall reimburse the issuer for—
>
> (1) any bonus or other incentive-based or equity-based compensation received by that person from the issuer during the 12-month period following the first public issuance or filing with the Commission (whichever first occurs) of the financial document embodying such financial reporting requirement; and
>
> (2) any profits realized from the sale of securities of the issuer during that 12-month period.

15 U.S.C. § 7243(a). The district court held that Jensen and Tekulve did not violate SOX 304 because "Basin's

misstatement was not issued due to any misconduct on the part of Defendants." SEC argues that this conclusion was legally erroneous because SOX 304 is concerned not with individual misconduct on the part of the CEO and the CFO, but rather with the misconduct *of the issuer*. Because this is a purely legal issue that may arise again on remand, we address it here.

The SEC's interpretation of SOX 304 is consistent with the plain language of the statute, which is the first thing we look to when interpreting statutes. *See King v. Burwell*, 135 S. Ct. 2480, 2489 (2015). SOX 304 provides for reimbursement to issuers required to prepare an accounting restatement "due to the material noncompliance *of the issuer*, as a result of misconduct, with any financial reporting requirement under the securities laws." 15 U.S.C. § 7243(a) (emphasis added). The clause "as a result of misconduct" modifies the phrase "the material noncompliance of the issuer," suggesting that it is the issuer's misconduct that matters, and not the personal misconduct of the CEO or CFO.

This conclusion is bolstered by the history of the statute. The report from the Senate Committee on Banking, Housing, and Urban Affairs on the bill that became the law indicated that the disgorgement remedy was developed with the broad goal of addressing concerns "about management benefitting from unsound financial statements." S. Rep. No. 107–205 at 26, 2002 WL 1443523 (July 3, 2002). That report echoed then-President George W. Bush's recommendations that "'CEOs or other officers should not be allowed to profit from erroneous financial statements,' and that 'CEO bonuses and other incentive-based forms of compensation [sh]ould be disgorged in cases of accounting restatement and misconduct." *Id.* It also emphasized that the disgorgement

remedy was intended as a significant expansion of the SEC's enforcement powers:

> For a securities law violation, currently an individual may be ordered to disgorge funds that he or she received "as a result of the violation." Rather than limiting disgorgement to these gains, the bill will permit courts to impose any equitable relief necessary or appropriate to protect, and mitigate harm to, investors.

*Id.* at 27.

Congress's intent to craft a broad remedy that focused on disgorging unearned profits rather than punishing individual wrongdoing is particularly apparent when comparing the legislative history of the Senate bill, S. 2673, with the legislative history of its House of Representatives counterpart, H.R. 3763. One proposed version of H.R. 3763 would have provided for disgorgement of all salary, commissions, and other earnings obtained by an officer or director "if such officer or director engaged in misconduct resulting in, or made or caused to be made in, the filing of a financial statement." Committee on Rules, H. Rep. No. 107–418 at 31, 2002 WL 704333 (April 23, 2002). The contrast between that language and the "as a result of misconduct" language in the final statute suggests that Congress knew how to draft a statute that would limit the disgorgement remedy to cases of officer or director misconduct, and chose not to do so.

While we are aware of no circuit court that has addressed this issue, most district courts to have examined it have

concluded that SOX 304 does not require CEOs or CFOs to have personally engaged in misconduct before they are required to disgorge profits under that statute. As a court in the District of Arizona has observed, "[a] CEO need not be personally aware of financial misconduct to have received additional compensation during the period of that misconduct, and to have unfairly benefitted therefrom." *SEC v. Jenkins*, 718 F.Supp.2d 1070, 1075 (D. Ariz. 2010); *see also SEC v. Baker*, No. A-12-CA-285-SS, 2012 WL 5499497, at *4 (W.D. Tex. Nov. 13, 2012) ("*Jenkins* persuasively rejected similar attempts by the officer defendant to read into the statute a requirement of misconduct by the officer."); *SEC v. Geswein*, No. 5:10CV1235, 2011 WL 4541303, at *3 (N.D. Ohio Sept. 29, 2011) ("[I]f [the issuer] had to prepare an accounting restatement because of its material noncompliance with financial reporting securities laws, and if that noncompliance was caused by [the issuer's] misconduct, then the CEO or CFO must provide certain reimbursements to [the issuer]."); *SEC v. Life Partners Holdings, Inc.*, 71 F. Supp. 3d 615, 625 (W.D. Tex. 2014) (holding that, in order to secure relief under SOX 304, the SEC was required to demonstrate that 1) the issuer was required to issue a restatement because of non-compliance with reporting requirements, 2) "the non-compliance was caused by misconduct within [the issuer]," and 3) the CEO received incentive pay within the relevant time period).

In accordance with its text and legislative history, we hold that SOX 304 allows the SEC to seek disgorgement from CEOs and CFOs even if the triggering restatement did not result from misconduct on the part of those officers. This is consistent with our conclusion elsewhere that the reimbursement provision is an equitable and not a legal remedy. *See Jasper*, 678 F.3d at 1130. "[A]mple authority

supports the proposition that the broad equitable powers of the federal courts can be employed to recover ill gotten gains for the benefit of the victims of wrongdoing, whether held by the original wrongdoer or by one who has received the proceeds after the wrong." *SEC v. Colello*, 139 F.3d 674, 676 (9th Cir. 1998). Here, disgorgement is merited to prevent corporate officers from profiting from the proceeds of misconduct, whether it is their own misconduct or the misconduct of the companies they are paid to run.[7]

## V. Exclusion of evidence

The final issue we address, as it is likely to appear again on remand, is whether the district court properly excluded evidence about an SEC injunction against Doug Hansen, whom Tekulve hired as Basin's Director of Finance in the period before the company went public. Evidentiary rulings are reviewed for abuse of discretion, and reversed only if the decision below was both erroneous and prejudicial. *Orr v. Bank of Am., NT & SA*, 285 F.3d 764, 773 (9th Cir. 2002).

In 1994 Hansen was the target of an SEC action alleging violation of Section 10(b) and Rules 10b–5 and 13b2–1 of the Exchange Act. "[W]ithout admitting or denying the allegations" against him, Hansen entered into a consent decree in which he agreed to a permanent injunction prohibiting him from committing securities fraud, an administrative order prohibiting him from practicing in front of the SEC, and other relief. The SEC argues that the district

---

[7] We decline to reach the issue of the meaning of "misconduct" under SOX 304. Once again, this issue was not presented or argued before us on appeal, and it goes significantly beyond what is needed to resolve the dispute before us.

court erred in excluding evidence of the injunction at trial because the evidence was relevant and not unduly prejudicial.

We affirm the district court's decision to exclude that evidence. Under Rule 403 of the Federal Rules of Evidence, a court may exclude evidence "if its probative value is substantially outweighed by a danger of . . . unfair prejudice, confusing the issues, [or] misleading the jury." Fed. R. Evid. 403. Here, there is a clear risk of unfair prejudice. The consent decree was not evidence of culpability, but admitting the settlement into evidence would run the risk of "permitt[ing] the jurors to succumb to the simplistic reasoning that if the defendant was accused of the conduct, it probably or actually occurred." *United States v. Bailey*, 696 F.3d 794, 801 (9th Cir. 2012).

Moreover, evidence of the two-decades-old injunction would be minimally probative at best. While there is no clear time bar on evidence of civil settlements, the Federal Rules of Evidence and the SEC's own internal policies both suggest that the probative value of prior bad acts is diminished after ten years. Under the Federal Rules, evidence that a witness in a civil or criminal trial has been convicted of a felony must be admitted within ten years of the conviction; after ten years, the conviction is admissible only if its probative value, "supported by specific facts and circumstances, substantially outweighs its prejudicial effect." Fed. R. Evid. 609(b)(1). Similarly, the SEC's own regulations on reporting for public companies require that directors and officers disclose legal proceedings "material to an evaluation of . . . ability and integrity" only from the last ten years. 17 C.F.R. 229.401(f). Because evidence of the injunction against Hansen was both unfairly prejudicial and not particularly probative, the district court's decision to exclude it was not error.

## VI.    Conclusion

We reverse the district court's decision to hold a bench trial in spite of the SEC's repeated objections in the months before trial that it had not consented to the withdrawal of the jury demand.  As a result, we vacate the district court's bench trial judgment and remand for proceedings consistent with this opinion.

We also reverse the court's interpretations of Exchange Act Rule 13a–14 and SOX 304.  Rule 13a–14 provides a cause of action against CEOs and CFOs who file false certifications as well as those who do not file certifications at all.  SOX 304 allows the SEC to pursue a disgorgement remedy against CEOs and CFOs of issuers required to prepare an accounting restatement as a result of misconduct, even if the officers did not engage in the relevant misconduct themselves.

We agree with the district court's exclusion of evidence regarding Hansen's consent decree and injunction.

We decline the request by the SEC that we order that the case be reassigned on remand to a different district judge.

All parties shall bear their own costs.

**VACATED** and **REMANDED**.

BEA, Circuit Judge, concurring:

I generally concur in the panel's analysis and disposition. I write separately only to clarify the intended scope of the new legal rules we announce today.

## A. Rule 13a–14

I turn first to our holding that Rule 13a–14, a regulation promulgated pursuant to the Exchange Act of 1934 ("Exchange Act"), permits a cause of action against a Chief Executive Officer ("CEO") or Chief Financial Officer ("CFO") for "false" certification of a financial report.[1] Maj. Op. at 5, 21–24. I agree that the district court erred to the extent it recognized a cause of action under Rule 13a–14 only for the failure to file any certification at all, and granted summary judgment to Defendants Peter Jensen ("Jensen") and Thomas Tekulve ("Tekulve") (collectively, "Defendants") on that basis. I therefore concur in the panel's reversal of the district court's grant of summary judgment to Defendants on this claim. Maj. Op. at 24.

Nevertheless, I would emphasize that not every inaccurate certification is "false" within the meaning of the rule we announce. Maj. Op. at 5, 21–24. Rather, the concept of falsity embodies a mental element. Merriam-Webster defines "false," as "intentionally untrue" (*e.g.*, "*false* testimony"),

---

[1] Rule 13a–14 provides: "Each report, . . . filed on Form 10–Q, Form 10–K [etc.] . . . under Section 13(a) of the Act . . . must include certifications . . . as an exhibit to such report. Each principal executive and principal financial officer of the issuer, or persons performing similar functions, at the time of filing of the report must sign a certification." 17 C.F.R. § 240.13a–14.

and as "intended or tending to mislead" (*e.g.*, "a *false* promise"). *False*, Merriam-Webster (last visited Aug. 9, 2016). Thus, to prevail on a cause of action for false certification in violation of Rule 13a–14, the SEC must show that the CEO or CFO who certified as true a financial statement which contained materially false or misleading information acted with some mental culpability.

Specifically, I would hold that liability for false certification under Rule 13a–14 may lie only where a CEO or CFO acts with knowledge or at least recklessness as to the falsity of a certification. I find support for this rule in the plain meaning of the word "false." But should some imaginative person claim "false" is somehow an ambiguous term, I also find support in the SEC's official release in connection with the final version of Rule 13a–14. *See* Certification of Disclosure in Companies' Quarterly and Annual Reports, Release No. 8124, 78 S.E.C. Docket 875, 2002 WL 31720215, at *9 (Aug. 28, 2002) ["Release No. 8124"].[2] As an agency's interpretation of its own regulation, Release No. 8124 is entitled to "substantial deference." *Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504, 512 (1994); *see also Chase Bank USA, N.A. v. McCoy*, 562 U.S. 195, 208–09 (2011) (With the exception of "post hoc rationalization[s]" taken by an agency "as a litigation position," or interpretations that are "plainly erroneous or inconsistent with the regulation," courts generally "defer to an agency's interpretation of its own regulation.").

---

[2] That release commences with the following preamble: "As directed by Section 302(a) of the Sarbanes-Oxley Act of 2002, we are adopting rules to require an issuer's principal executive and financial officers each to certify the financial and other information contained in the issuer's quarterly and annual reports." *Id.* at *1.

SEC Release No. 8124 envisions that liability for a "false" certification will require at least recklessness on the part of the certifying officer. Under a section entitled "Liability for False Certification," Release No. 8124 provides:

> An issuer's principal executive and financial officers already are responsible as signatories for the issuer's disclosures under the Exchange Act liability provisions [citing Sections 13(a) and 18 of the Exchange Act] and can be liable for material misstatements or omissions under general antifraud standards [*i.e.* under Exchange Act Section 10(b) and Rule 10(b)-5] and under our authority to seek redress against those who cause or aid or abet securities law violations [citing various sections of the Exchange Act which impose reporting requirements on the *issuer*]. An officer providing a false certification potentially could be subject to Commission action for violating Section 13(a) or 15(d) of the Exchange Act and to both Commission and private actions for violating Section 10(b) of the Exchange Act and Exchange Act Rule 10b-5.

Release No. 8124, at *9. I address each of the provisions listed in Release No. 8124 as a basis for liability for false certification in turn.

Section 13(a) of the Exchange Act, codified at 15 U.S.C. § 78m, requires "'every issuer having securities registered' with the SEC to file annual [and quarterly] reports including

certain financial information." *Ponce v. S.E.C.*, 345 F.3d 722, 734 (9th Cir. 2003). Because the text of Section 13(a) focuses on the *issuer's* conduct, an aiding and abetting theory is necessary to hold the CEO or CFO liable for a Section 13(a) violation. In the securities context, aiding and abetting liability requires the SEC to establish "(1) the existence of an independent primary wrong [by the issuer], (2) *actual knowledge or reckless disregard* by the alleged aider and abettor of the wrong and of his or her role in furthering it, and (3) substantial assistance in the wrong." *Levine v. Diamanthuset, Inc.*, 950 F.2d 1478, 1483 (9th Cir. 1991) (emphasis added) (setting forth the elements of a prima facie cause of action for aiding and abetting securities fraud); *see also Ponce*, 345 F.3d at 734 (SEC must prove the same elements in order to prevail on a claim that the defendant aided and abetted an issuer's violation of Section 13(a) by causing the issuer to file false annual and quarterly reports). In sum, at least recklessness as to the falsity of a certification is required to hold an officer liable for aiding and abetting an issuer's issuance of a false or misleading financial statement in violation of Section 13(a) by falsely certifying the statement as true.[3]

---

[3] My colleagues incorrectly suggest that our precedent leaves open the possibility that Section 13 may permit the imposition of liability on an *individual defendant* without a showing of mental culpability. *See* Maj. Op. at 24 n.6. This misconception appears to stem from a misreading of a footnote in *Ponce*. The binding holding of *Ponce* in fact forecloses any argument that an individual could be held liable for a Section 13(a) without a showing that he acted with at least recklessness. In *Ponce*, we specifically held that a finding that an *issuer* had violated Section 13(a) "does not end our inquiry with respect to [an individual's] liability," because Section 13(a) applies only to issuers of securities. *Ponce*, 345 F.3d at 737. Ponce was a certified public accountant who had prepared and certified the issuer's financial statements. *Id.* at 725–26. To hold Ponce liable, the SEC was required to establish the additional

Section 15(d) of the Exchange Act imposes an analogous

elements necessary for "aider and abettor liability." *Id.* Accordingly, we instructed that "it *must* be found that . . . (2) Ponce had *knowledge* of the [issuer's] primary violation and of his or her own role in furthering it; and (3) [that] Ponce provided substantial assistance in the primary violation." *Id.* (emphasis added). Then, in a footnote, we queried whether knowledge was a necessary element of the "third prong" (*i.e.*, the substantial assistance prong) of aider and abettor liability, noting that the SEC had assumed that it was. We cited "one [administrative] proceeding" in which the SEC had held that scienter was not a necessary requirement to establish a Section 13(a) violation. *Id.* at 737 n.10 (citing *In the Matter of WSF Corp.*, 2002 WL 917293, at *3 (SEC, May 8, 2002)).

But the case we cited, *In the Matter of WSF Corp.*, was about issuer liability—not aider and abettor liability. 2002 WL 917293, at *2, 6 (holding that an issuer, WSF Corporation, had violated Section 13(a) by virtue of its failure to file various mandatory annual and quarterly reports; holding that no showing of scienter on the part of WSF Corporation was required). Thus, the administrative proceeding we cited was, in fact, irrelevant to the question in *Ponce*—whether aider and abettor liability requires a showing of recklessness or knowledge. And even conceding that our dicta in *Ponce* created some ambiguity as to whether the "third prong" of aider and abettor liability incorporates a scienter requirement, *Ponce* unambiguously held that the *second* prong of a Section 13(a) aider and abettor theory requires the SEC to establish both "knowledge" of both "the primary violation" and the aider and abettor's "own role in furthering" that violation. In short, the only way to hold a CEO or CFO liable for a Section 13(a) violation is through aider and abettor liability, which requires knowledge of the falsity of the statement certified.

Thus, our precedent leaves no room for doubt that a CEO or CFO cannot be held liable for an issuer's violation of Section 13(a) without a showing that he acted with knowledge of such falsity. *But cf. Levine*, 950 F.2d at 1483 (suggesting that recklessness is sufficient). Accordingly, I would make clear that the SEC may not attempt to circumvent our precedent, or to take a position in this litigation contrary to its prior, official position with respect to officer liability for false certifications, simply because we today adopt a more expansive view of Rule 13a–14 as permitting yet another cause of action against CEOs and CFOs who falsely certify financial reports.

reporting requirement on the issuer. *See* 15 U.S.C. § 78o(d) ("Each issuer [of registered securities] . . . shall file with the Commission, in accordance with such rules and regulations as the Commission may prescribe . . . such supplementary and periodic information, documents, and reports as may be required pursuant to section 78m of this title [*i.e.*, Section 13(a)] in respect of a security registered [with the SEC]."). In *S.E.C. v. Fehn*, 97 F.3d 1276 (9th Cir. 1996), this Circuit recognized that a cause of action may lie against an executive for *an issuer's* violation of Section 15(d)—again under an aiding and abetting theory. *Id.* at 1288. We concluded that the elements were similar to those required for aiding and abetting under Section 10(b) (securities fraud): "(1) the existence of an independent primary violation; (2) actual knowledge by the alleged aider and abettor of the primary violation and of his or her own role in furthering it; and (3) 'substantial assistance' in the commission of the primary violation." *Id.* Thus, under our precedent, the SEC must establish knowledge to hold a CEO or CFO liable under Section 15(d) for falsely certifying a financial report as true.

A CEO or CFO could also be held liable, either directly or through an aiding and abetting theory, under the Exchange Act's anti-fraud provisions. Liability for securities fraud under Exchange Act Section 10(b) and its implementing regulation, Rule 10b-5 (which collectively prohibit fraud in the purchase or sale of securities),[4] requires a showing of

---

[4] "Section 10(b), the central antifraud provision of the Securities Exchange Act, 15 U.S.C. § 78j(b), makes it unlawful 'for any person, directly or indirectly':

> To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any

"scienter." *Id.* at 1289 ("To prove a primary violation of Section 10(b) of the Securities Exchange Act, the SEC was required to 'show that there has been a misstatement or omission of material fact, made with scienter.'" (citation omitted)). We have held that "[k]nowledge or recklessness [as to whether statements made in connection with the sale of securities are false or misleading] is required for a finding of scienter under § 10(b)." *Howard v. Everex Sys., Inc.*, 228 F.3d 1057, 1063 (9th Cir. 2000). Sitting en banc, we have previously defined "recklessness" for purposes of Section 10(b) violations as "a highly unreasonable omission, involving not merely simple, or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers

> manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

Rule 10b–5 further defines the conduct prohibited under Section 10(b), making it unlawful:

> (a) [t]o employ any device, scheme, or artifice to defraud,

> (b) to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

> (c) to engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

*S.E.C. v. Fehn*, 97 F.3d 1276, 1289 (9th Cir. 1996) (quoting 15 U.S.C. § 78j(b); 17 C.F.R. § 240.10b–5).

that is either known to the defendant or is so obvious that the actor must have been aware of it." *Id.* (quoting *Hollinger v. Titan Capital Corp.*, 914 F.2d 1564, 1569 (9th Cir. 1990) (en banc)). In other words, direct liability under Section 10(b) and Rule 10b-5 would also require the SEC to establish that the CEO or CFO acted either knowingly or with "inexcusable negligence" in certifying a financial report as true when the report in fact contained false or misleading statements. Alternatively, aiding and abetting liability for *the issuer's* commission of securities fraud would require a showing that the CEO or CFO knowingly or recklessly aided the issuer's commission of securities fraud by falsely certifying as true a financial report that in fact contained false or misleading statements. *See Levine*, 950 F.2d at 1483.

Finally, SEC Release No. 8124 cites Section 18 of the Exchange Act as a basis for imposing liability on a CEO or CFO who falsely certifies a financial statement as true. Section 18 imposes *direct* liability on "[a]ny person who . . . make[s] or cause[s] to be made any statement in any application, report, or document . . . which . . . at the time and in the light of the circumstances under which it was made false or misleading with respect to any material fact." 15 U.S.C. § 78r(a). Plainly, a false certification is a "statement" which is "false or misleading with respect to any material fact"—namely, that the certified financial statement is accurate. Though mental culpability is not an element of a prima facie Section 18 violation, that section contains a "defense of good faith": A person who makes a false or misleading statement is *not* liable under Section 18 if that person can "prove that he *acted in good faith and had no knowledge* that such statement was false or misleading." *Id.* (emphasis added). Though the burden rests on the defendant under Section 18 rather than on the SEC as it does under

related securities laws, Section 18—like the other provisions discussed above—ultimately requires the fact-finder to conclude that the CEO or CFO had knowledge of the falsity of a certification in order for the SEC to prevail on a claim for false certification.

From consideration of the sources cited, I conclude that—simultaneously with its issuance of Rule 13a–14—the SEC explicitly considered and listed various mechanisms through which an officer may be held liable for a false certification. Each of the enforcement mechanisms listed requires the executive to have acted with knowledge or recklessness as to the falsity of a certification in order to be held liable for it. We may therefore reasonably infer that the SEC, in promulgating Rule 13a–14, intended any cause of action brought thereunder to require a showing of recklessness or knowledge. The SEC's official position on this issue is entitled to deference, *Thomas Jefferson Univ.*, 512 U.S. at 512, particularly given that it is consistent with the plain meaning of the word, "false," as explained above.

## B. SOX 304

I also concur in today's holding that Section 304 of the Sarbanes-Oxley Act ("SOX 304") permits the SEC to seek disgorgement of executive compensation whenever an issuer is required to restate a financial report because of *the issuer's* misconduct—personal misconduct on the part of the CEO or CFO is not required. Maj. Op. at 27.[5] I therefore concur in

---

[5] SOX 304 provides:

"If an issuer is required to prepare an accounting restatement due to the material noncompliance of the

the panel's reversal of the district court's interpretation of SOX 304 as requiring the SEC to establish personal "misconduct" on the part of the CEO and CFO. Maj. Op. at 31. However, the panel's rule fails to provide sufficient instruction to the district court judge on remand, who will be required to determine whether the jury's findings with respect to the SEC's Claims One through Six, coupled with other relevant record evidence, establish that Basin Water, Inc. committed "misconduct."[6] Neither we, nor the SEC, have previously explained what qualifies as "misconduct" as necessary to trigger disgorgement under SOX 304, and thus

---

> issuer, *as a result of misconduct*, with any financial reporting requirement under the securities laws, the chief executive officer and chief financial officer of the issuer shall reimburse the issuer for . . . any bonus or other incentive-based or equity-based compensation received by that person from the issuer during the 12-month period following the first public issuance or filing with the Commission (whichever first occurs) of the financial document embodying such financial reporting requirement; and . . . any profits realized from the sale of securities of the issuer during that 12-month period."

15 U.S.C. § 7243(a) (emphasis added).

[6] As explained fully in the panel's opinion, Claims One through Six sought both legal and equitable relief, and the SEC was therefore entitled to a jury trial on those claims. *See* Maj. Op. at 8 & n.2 (summarizing the seven causes of action brought by the SEC); *Tull v. United States*, 481 U.S. 412, 422 (1987). We have previously held, however, that a claim for disgorgement under SOX 304 is purely equitable, and therefore the SEC has no right to demand a jury trial for its claims seeking disgorgement pursuant to SOX 304. *S.E.C. v. Jasper*, 678 F.3d 1116, 1130 (9th Cir. 2012).

further clarification regarding the meaning of "misconduct" is warranted here.

I would adopt a plain language understanding of the word, which Merriam Webster defines as "1. mismanagement" or "2. intentional wrongdoing; *specifically*: deliberate violation of a law or standard . . . ." *Misconduct*, Merriam-Webster (last visited Aug. 10, 2016). In my view, "misconduct" requires an intentional violation of a law or standard (such as GAAP) on the part of the issuer, which can be shown by evidence that any employee of the issuer (not only the CEO or CFO), acting within the course and scope of that employee's agency, intentionally violated a law or corporate standard.

Such an understanding is consistent with the statutory scheme of which SOX 304 is a part, as well as the case law to date. SOX 302, entitled "Corporate responsibility for financial reports," requires CEOs and CFOs to "certify in each annual or quarterly report" that the officers have reviewed the report and, based on their knowledge, the report does not contain any false or misleading statements or omissions of material fact. 15 U.S.C. § 7241(a). More importantly, the signing officers must certify that they have "*designed . . . internal controls* to ensure that material information relating to the issuer . . . is made known to such officers by others within [the issuer], particularly during the period in which the periodic reports are being prepared," and the officers "have evaluated the effectiveness of the issuer's internal controls as of a date within 90 days prior to the report." *Id.* (emphasis added).

In short, SOX 302 (in conjunction with other securities rules and regulations) imposes a management obligation on

CEOs and CFOs to maintain internal controls that will be effective in ensuring that other agents of the issuer are—for purposes of the present case—recording income in a manner that produces accurate and complete financial statements in accord with GAAP. *See id.*; *see also* 17 C.F.R. § 229.601(b)(31) (requiring CEOs and CFOs to certify, in accordance with Rule 13a–14, "exactly" as follows: "The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures . . . and internal control over financial reporting . . . and have . . . [among other things] [d]esigned such internal control over financial reporting . . . to provide reasonable assurance regarding the reliability of financial reporting and *the preparation of financial statements for external purposes in accordance with generally accepted accounting principles* . . . ." (emphasis added)); Maj. Op. at 6 n.1.

In turn, SOX 304 encourages vigorous compliance with SOX 302 by making CEOs and CFOs subject to disgorgement if their internal controls fail to prevent (or to detect prior to the publication of a false or misleading financial report) intentional wrongdoing by any authorized agent of the issuer. When the internal controls fail to detect such wrongful behavior, a CEO or CFO (and thus, by extension, the issuer itself) has committed "mismanagement"—*i.e.*, the first definition of "misconduct."[7]

---

[7] The definition I propose would also be consistent with the handful of lower court decisions which have considered the circumstances under which CEOs may be subject to disgorgement under SOX 304. *Compare, e.g.*, *SEC v. Jenkins*, 718 F. Supp. 2d 1070, 1072, 1077 (D. Ariz. 2010) (holding that the SEC's allegations that a CFO, Chief Operating Officer, and other employees intentionally attempted to conceal losses from write offs of uncollected receivables would, if proven, establish "misconduct"

In sum, the district court should consider on remand whether the evidence establishes that Basin was required to restate its financial reports as a result of an intentional violation of any law or standard by any Basin employee acting within the course and scope of that employee's agency.

\*   \*   \*

Our holdings today with respect to both Rule 13a–14 and SOX 304 resolve difficult and complex issues of first impression. My colleagues would prefer to announce broad, but unclear rules and to leave for another day important questions—questions which will likely be determinative on remand of this case—about the precise scope of the rules we announce. While I am generally in accord with the notion that we should decide only that which is strictly necessary to decide, I disagree with my colleagues' suggested course in this particular case.[8] What is culpably "false" and what

---

for purposes of SOX 304), *with e.g.*, *SEC v. Life Partners Holdings, Inc.*, 71 F. Supp. 3d 615, 618, 625 (W.D. Tex. 2014) (finding no "misconduct" within the meaning of SOX 304—notwithstanding a jury finding that the issuer had filed numerous false or misleading financial statements in violation of Exchange Act Rule 13(a) and related regulations—because those who prepared the inaccurate financial statements had reasonably relied on the issuer's outside auditor, Ernst & Young, in good faith, and the mistakes which ultimately required restatement and upon which the securities violations were predicated were discovered only after-the-fact and corrected).

[8] Even Chief Justice Roberts, a great proponent of judicial restraint, has acknowledged: "[W]hile it is true that '[i]f it is not necessary to decide more, it is necessary not to decide more,' . . . , sometimes it is necessary to decide more. There is a difference between judicial restraint and judicial abdication." *Citizens United v. Fed. Election Comm'n*, 558 U.S.

constitutes "misconduct" are central to the disposition of this case. We have discretion to decide those issues to guide this case on remand. We ought to do so. *Cf. Singleton v. Wulff*, 428 U.S. 106, 121 (1976) ("The matter of what questions may be taken up and resolved for the first time on appeal is one left primarily to the discretion of the courts of appeals, to be exercised on the facts of individual cases.").

It is well-established that where we "undertake[] to decide [a] claim" that "is properly before th[is] court, [we] [are] not limited to the particular legal theories advanced by the parties, but rather retain[] the independent power to identify and apply the proper construction of governing law." *Kamen v. Kemper Fin. Servs., Inc.*, 500 U.S. 90, 99 (1991); *cf. Engquist v. Oregon Dep't of Agric.*, 478 F.3d 985, 996 n.5 (9th Cir. 2007) ("[W]here an issue is purely legal, and the . . . part[ies] would not be prejudiced, we can consider an issue not raised below."), *aff'd sub nom. Engquist v. Oregon Dep't of Agr.*, 553 U.S. 591 (2008).

Having properly undertaken to answer the broader question whether Rule 13a–14 requires CEOs and CFOs only to certify financial reports, or whether it requires them to do so truthfully, we act well within our discretion when we clarify precisely *what we mean* when say that Rule 13a–14 permits a cause of action against CEOs and CFOs who "falsely" certify a financial statement (regardless of the parties' failure specifically to brief that nuance). Whether a cause of action includes a mental element is a purely legal question that, for reasons of judicial economy, we are far better situated than the district court to resolve: Our mandate

---

310, 375 (2010) (Roberts, C.J., concurring) (second alteration in original) (citation omitted).

specifically directs the district court to apply our newly minted rule on remand, no prior precedent has addressed what it means for a certification to be "false" (reasonably so, as we have not previously recognized this cause of action), and this issue is likely to be determinative to the SEC's claim.[9]

The same analysis applies with respect to our new interpretation of SOX 304. We announce today that CEOs and CFOs may be subject to disgorgement not only when *they* commit "misconduct," but also when *any agent* of the issuer (acting within the course and scope of his agency) commits "misconduct" on behalf of the issuer. Given the lack of any definition of "misconduct" in the securities laws and regulations, or in our own precedent, the district court will be hard-pressed on remand to determine whether, for example, evidence of an accounting error qualifies as "misconduct" within the meaning of the rule we announce, absent some clarification regarding what "misconduct" for purposes of SOX 304 actually means. The clarification provided herein answers purely legal questions and in no way opines on the factual issues the district court must resolve in the first instance on remand (*e.g.*, whether the SEC has adduced evidence sufficient to establish that Defendants committed misconduct on the record before the court).

Lastly, I suggest the panel bear in mind that, due to the district court's improvident decision to proceed with a bench

---

[9] Because Basin *did*, in fact, restate information in some financial reports certified by Defendants, there will be little dispute on remand that the certifications were in some sense "incorrect." Thus, the critical question will likely be *what more* the SEC must show to establish that the certifications were also "false"—*i.e.*, what mental state is required to make an incorrect certification a "false" one?

trial in the initial proceedings, our holding today vacates a host of factual and legal conclusions that were, unfortunately, the product of significant resource investment by all parties involved. To remand this case for application of new legal rules that are so woefully vague as to virtually guarantee another appeal to this Court and remand—after yet another significant resource investment—would be the paradigm of judicial inefficiency.

Subject to these additional clarifications, I concur in the panel's opinion.